UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

TIMOTHY RODGERS,                                    DOCKET NO.:

                            Plaintiff,

        -against-                                   COMPLAINT

MERCY COLLEGE, DR. JOSE HERRERA,
TIMOTHY HALL, DR. KRISTINE SOUTHARD,
and WILLIAM LATIMER

                            Defendants.            JURY TRIAL DEMANDED
------------------------------------------------------------X

        PLAINTIFF, TIMOTHY RODGERS by and through his attorneys, the LAW OFFICES OF

FREDERICK K. BREWINGTON, as and for his Complaint against the Defendants, states and

alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action seeking monetary relief, including past and on going economic

loss, compensatory and punitive damages, disbursements, costs and fees for violations of Plaintiff's

rights, brought pursuant to 42 U.S.C. §1981 of the Civil Rights Act of 1866, 42 U.S.C. § 2000 et

sec., (as amended), Title VI, 42 U.S.C. § 2000(d), et sec., the Fourteenth Amendment, and New York

State Human Rights Law, Executive Law §296.

2.      Specifically, Plaintiff alleges that the collective Defendants, acting individually and

in conspiracy with each other, engaged in discrimination, retaliation and negligently, wantonly,

recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of his

appropriate employment position, title and pay, retaliating against Plaintiff and ultimately

terminating Plaintiff. These retaliatory acts resulted in a fully negative impact upon Plaintiff,

including humiliation, embarrassment, depravation of job opportunities, loss of income and

retirement benefits, loss of career, permanent injury and harm and other results which continue to mount.

3.      Specifically, Plaintiff alleges that the collective Defendants engaged in retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position, title and pay by terminating Plaintiff from employment on August 16, 2019. These acts were taken against Plaintiff because of his opposition to violations of civil rights, business ethics, violations of personal ethical standards and violations of applicable State and Federal laws. These acts committed by Defendants resulted in harassment, retaliation, adverse employment consequences, negative impact regarding Plaintiff, humiliation, embarrassment, depravation of job opportunities, deprivation of employment, loss of career, permanent injury and harm and other results which continue to mount.

4.      Plaintiff alleges that collective Defendants directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and in retaliation, enacting and executing retaliatory policies and procedures which caused Plaintiff to suffer injuries, which include but are not limited to: loss of employment, loss of income, emotional distress, loss of self worth, humiliation, embarrassment, loss of career, loss of reputation, loss of benefits, pay, future income and pension funds.

5.      Said acts were done knowingly with the consent and condonation of MERCY COLLEGE (hereinafter "the COLLEGE"), and DR. JOSE HERRERA, TIMOTHY HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD in their individual and in their official capacities, with the express purpose of targeting, injuring and silencing  Plaintiff, and generally violating his rights as protected by the United States and New York State Constitutions, federal and

state statutes, rules and regulations.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

7.      This Court is requested to exercise pendent jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C.§ 1367.

8.      Venue in the Southern District of New York is proper under 28 U.S.C. §1391, based on the fact that the Defendants conduct business in the State of New York, specifically Westchester County.

## PARTIES

9.      Plaintiff, TIMOTHY RODGERS (hereinafter "Professor RODGERS" or "Plaintiff"), at all times relevant in this Complaint, is a Black man and citizen of the United States of America. Professor RODGERS was employed by the College of New Rochelle (hereinafter "CNR") from June 2, 1997 until being wrongfully terminated by CNR and MERCY COLLEGE on August 16, 2019. Professor RODGERS resides in the County of Suffolk, State of New York and at the time of his termination was an Assistant Professor and Campus Director for The College of New Rochelle.

10.     During all times relevant to this Complaint the Defendant MERCY COLLEGE was and is a private, non-profit, coeducational research university with its main campus located in Dobbs Ferry, New York, with additional locations in Manhattan, Bronx and Yorktown Heights. Upon information and belief, the COLLEGE oversees, maintains, manages, supervises, controls and is the employer of Defendants DR. JOSE HERRERA, TIMOTHY HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD. The COLLEGE is an employer within the definition of the New York State Executive Law, and employs well over 15 employees.

11.     The COLLEGE, at all times relevant, is a private not-for-profit entity that receives and utilizes federal funds and assistance in the conducting of its functions within the County of Westchester, State of New York. Such federal funds include but are not limited to federal aid received through Federal Financial Aid programs and Federal Work Study Programs. These federal funds were issued to help students afford the tuition and expenses of Defendant COLLEGE, and are paid to Defendant COLLEGE.

12.     DEFENDANT, DR. JOSE HERRERA, (hereinafter "DR. HERRERA"), at all times relevant to this Complaint was the Provost of The College of New Rochelle and is sued in his individual and official capacity, and was at all times herein mentioned a decision maker and supervisor of the staff of CNR and the COLLEGE, and was employed by the COLLEGE under the direction of Defendant MERCY COLLEGE. DR. HERRERA was at all times relevant to this Complaint acting in furtherance of the scope of his employment.

13.     DEFENDANT, TIMOTHY HALL, (hereinafter "MR. HALL"), at all times relevant to this Complaint was the President of MERCY COLLEGE and is sued in his individual and official capacity, and was at all times herein mentioned a decision maker and supervisor of the staff of MERCY COLLEGE, and was employed by the COLLEGE under the direction of Defendant MERCY COLLEGE. MR. HALL, a White man, was at all times relevant to this Complaint acting in furtherance of the scope of his employment.

14.     DEFENDANT, WILLIAM LATIMER (hereinafter "MR. LATIMER"), was, at all times relevant to this Complaint, the Vice President of MERCY COLLEGE and the former President of the College of New Rochelle, and is sued herein in his individual and official capacity, and at all times herein mentioned a decision maker and supervisor of the staff of the COLLEGE, and was

4

employed by the COLLEGE under the direction of Defendant MERCY COLLEGE. MR. LATIMER, a White man, was at all times relevant to this Complaint acting in furtherance of the scope of his employment.

15.     DEFENDANT, DR. KRISTINE SOUTHARD, a white woman (hereinafter "DR. SOUTHARD") was at all times relevant to this Complaint the Executive Director of MERCY COLLEGE and the former Dean of The School of Resources at the College of New Rochelle, and is sued in her individual and official capacity, and is at all times herein mentioned a decision maker and supervisor of the staff of MERCY COLLEGE, and is working on behalf of the COLLEGE as an employee, agent and/or contractor for the COLLEGE under the direction of Defendant COLLEGE and was at all times relevant to this complaint acting in furtherance of the scope of her employment.

## FACTUAL ALLEGATIONS

16.     Professor RODGERS was employed by the College of New Rochelle from June 2, 1997 until MERCY COLLEGE took over that college and its staff on August 16, 2019. There was only one faculty member who had more employment experience with The College of New Rochelle than Plaintiff, who was employed by CNR twenty two (22) years.

17.     At The College of New Rochelle Plaintiff served as Campus Director for seven (7) years and as an Assistant Professor of Liberal Arts for thirteen (13) years. He taught classes each and every semester, including summers, for twenty two (22) consecutive years.

18.     Plaintiff TIMOTHY RODGERS was one of only two (2) Black Administrators at The College of New Rochelle and upon information and belief, there were no African American administrators at MERCY COLLEGE at the relevant time of this Complaint.

5

19.     During his tenure at the College of New Rochelle, Professor RODGERS received

numerous awards, recognitions and achievements including, but not limited to:

- Being elected five consecutive years by his colleagues of the South Bronx Campus to represent those colleagues on the Instructional Staff Committee regarding all Faculty matters;

- Elected to represent the School of Resources for all six campuses on the Committee for Rank, Salary and Compensation;

- Elected by his colleagues of the School of New Resources to represent them on the College Senate for six consecutive years;

- Elected to the Senate Chair for two years. Professor RODGERS was the first Black person to hold this position in the 100 year history of the College of New Rochelle;

- Plaintiff was publicly acknowledged for his outstanding contributions to CNR, its faculty and students by Defendant President LATIMER in 2018; and

- Plaintiff Chaired the Presidential Advisory Committee from 2018 until his termination by Defendant COLLEGE.

20.     Furthermore, Plaintiff received an employment evaluation score above the level of

satisfactory during each of his twenty two (22) years at CNR.

21.     Plaintiff excelled and fostered a distinguished career at CNR through the regimes of

numerous Campus Directors, four (4) different Deans and four (4) separate Presidents of that

institution.

22.     Given his tenure and standing at CNR, Plaintiff performed a critical role in easing the

transition of CNR staff and students to Defendant COLLEGE.

23.     The College of New Rochelle was a private not-for-profit College with campuses in

New Rochelle and  five other locations located in the Bronx, Brooklyn, Harlem and Yonkers.

24.     Founded by the Ursuline Sisters in 1904, The College of New Rochelle was comprised of four schools, the School of Arts & Sciences, the School of Nursing & Healthcare Professions, the Graduate School and the School of New Resources for Adult Learners.

25.     According to its website, MERCY COLLEGE was founded in 1950 by the Sisters of Mercy. Mercy College is a private, non-sectarian, non-profit, coeducational college that offers more than ninety (90) undergraduate and graduate degree and certificate programs within five (5) schools: Business, Education, Health and Natural Sciences, Liberal Arts and Social and Behavioral Sciences. MERCY COLLEGE has campuses in Dobbs Ferry, Bronx, Manhattan and Yorktown Heights which are all located in New York State.

26.     In discussing the transition from the College of New Rochelle to MERCY COLLEGE, Defendant LATIMER declared:

> "Since the onset of the financial crisis in 2016, The College of New Rochelle community has worked diligently to sustain the College. These collective efforts on the part of the Board, administration, faculty, staff, alumnae, and community partners have made possible the graduation of more-than 1,800 students during the past two commencements, including the 2018 commencement over which I had the honor and privilege to preside. Despite our successes, the financial status of the College underscored the necessity to identify an institution that would provide a safe haven for students first and foremost while also doing our best to protect staff and students and CNR's Ursuline legacy. We are blessed that our work with Mercy College provides the basis to accomplish each of these aims. By virtue of alignment of mission, quality of the education provided, geographical proximity across Westchester and NYC, and comparable or lower cost, we could not find a better institution to facilitate the transition of students in a seamless manner to continue their education than Mercy College. There is much work left to do but CNR stands ready and able to facilitate the process to enable students to continue their education and complete their degrees with Mercy College."

27.    Defendant HALL, as President of MERCY COLLEGE declared:

"Mercy College has taken over the responsibility of serving The College of New Rochelle students so that they are able to continue their education uninterrupted and graduate on time. More than providing them a new educational home, the agreement has been carefully considered and implemented over many months to go above and beyond to create a seamless pathway for CNR students to join the Mercy College community with minimal disruption to their academic careers. Our recent academic growth and strong financial profile make this rare opportunity possible and, the long-term impact will be a stronger Mercy College."

28.    According to an article on MERCY COLLEGE'S website, the College of New Rochelle ("CNR") "will wind down operations due to financial difficulties and is expected to close following the summer 2019 semester in August. CNR students will then begin the fall 2019 semester at Mercy College."

29.    During the first week of March 2019, Plaintiff was invited and attended a meeting in the library on the campus of CNR. This meeting was called by the School of New Resources' Dean KRISTINE SOUTHARD. Present at that meeting was Ms. SOUTHARD's Executive Staff which included Andy Baker, Eliana Bront, David Gowey, Antonio Delgado, Arlene Hogan and Plaintiff, as well as full time faculty.

30.    The stated purpose of this meeting was to introduce those assembled staff of CNR to the COLLEGE's Administrator, DR. HERRERA. DR. HERRERA was accompanied by his Dean, Donna Dean and the head of the Human Resources Department.

31.    DR. HERRERA welcomed the CNR staff to MERCY COLLEGE and informed the attendees that their contracts were being prepared. He further stated that if the contracts were already prepared that he would have all those gathered at that meeting sign the contracts right then.

32.     Following DR. HERRERA's welcome, the Human Resources person told the staff about the COLLEGE's benefit package. Donna Dean gave the staff an orientation on the school model and the staff, including Plaintiff, left the meeting congratulating each other on their new jobs.

33.     On or about March 14, 2019, employment contracts from Defendant MERCY COLLEGE were extended to CNR faculty and administrators, including Plaintiff. Shortly thereafter, Plaintiff was informed that he would be interviewed by Defendant COLLEGE.

34.     What was termed an "interview" was conducted at 8:00 in the morning with two Caucasian employees of Defendant COLLEGE. The interview was rushed, only touched upon surface questions, and a large portion of this short interview was spent by the COLLEGE's personnel preparing the interview space for the candidates arriving after Professor RODGERS.

35.     During this "interview", not one of Professor RODGERS' accomplishments or recognitions were discussed. The fact that he was the chair of the Senate and the first Black Chairperson in the one hundred year history of CNR was never mentioned or acknowledged by Defendant COLLEGE's interviewers. The fact that Professor RODGERS was on a tenure and rank committee and subsequently voted to Chair that committee was never mentioned, nor was the fact that he was on the Presidential Advisory Committee and asked to Chair that committee. The interviewers never discussed how or why Professor RODGERS transitioned from Assistant Professor to Campus Director of his own campus and was then tasked to be Campus Director of the largest and busiest of Campuses. The fact that Defendant COLLEGE showed no interest in the employment achievements and qualifications of Plaintiff demonstrates the disparate, discriminatory treatment suffered by Plaintiff.

9

36.    At the conclusion of the interview, despite his tenure, loyalty and achievements, Plaintiff was simply informed that someone would get back to him. However, Defendants got back at Plaintiff for speaking out against the racist practices he witnessed by removing him as Campus Director and then terminating him.

37.    In early March of 2019, a student enrollment team from Defendant COLLEGE arrived on the campus of CNR and delivered, as former student Gerard Johnson described, "the devastating news [that] The College of New Rochelle was closing, and our destiny was uncertain. Immediate fear set in from the shocking information and was traumatically detrimental to the student body..." Existing CNR staff and Defendant COLLEGE's enrollment team assembled in order to answer questions from students and staff regarding their transition to MERCY COLLEGE. The CNR Campus Directors were ordered to pack the student's academic records. At this approximate time, Plaintiff was formally introduced to the staff of Defendant COLLEGE.

38.    On or about April of 2019, during a full staff meeting at the CNR Library, Defendants HALL and HERRERA openly promised all College of New Rochelle administrators and faculty that all the administrators and faculty would transition to Defendant COLLEGE upon CNR's closure.

39.    In April of 2019 at the Brooklyn Campus of CNR on the third floor of Restoration Plaza, then President of CNR, Defendant LATIMER, held a meeting to address the fears of faculty and the student body regarding the transition of staff and students to MERCY COLLEGE. Mr. LATIMER informed those gathered that a solution was reached between himself and the President of MERCY COLLEGE, Defendant HALL, that would alleviate those fears and concerns regarding the transition of staff to MERCY COLLEGE.

10

40.     Also in attendance at that meeting were Dr. Brian Johnson, Defendant HERRERA, and staff of the Human Resources Departments of both Defendant COLLEGE and CNR. These administrators, along with Defendants LATIMER and HALL, assured a smooth and seamless transition of staff and students from CNR to MERCY COLLEGE. During the question and answer period which was moderated by Defendants LATIMER and HALL, one student asked, "will Professor Rodgers have continued employment with Mercy College?" Both Defendant Presidents LATIMER and HALL responded in the affirmative, assuring all in attendance that Plaintiff Professor RODGERS would continue in his employment and relationship with the students.

41.     However, despite such assurances, in August of 2019 Plaintiff was notified that he was to be terminated instead. The students were devastated that the Presidents of both colleges failed to keep their word and that they would be losing Plaintiff Professor RODGERS.

42.     To further the damage and make clear the discriminatory animus directed at, and inflicted upon Plaintiff, although Professor RODGERS' employment as Assistant Professor and Brooklyn Campus Director was terminated, the Brooklyn Campus remained open for an additional year until about May of 2020.

43.     During a staff meeting on or about May 2, 2019 Defendant DR. SOUTHARD displayed a racially offensive video to her staff which on that date was comprised of approximately seven (7) other staff members, including Plaintiff and one (1) other African American.

44.     DR. SOUTHARD, who is White, repeatedly used the word "nigger" (hereinafter "n word"). DR. SOUTHARD repeatedly and clearly spoke the "n word" to her audience and/or constantly repeated the word in a manner in which the audience would hear the derogatory and offensive word.

11

45.     Upon information and belief, on the morning of May 2, 2019, Defendant MERCY COLLEGE oversaw the day-to-day operations of CNR, although there was yet to be an official announcement of the transition from CNR to The COLLEGE. On that date Defendant SOUTHARD held a staff meeting at the New Rochelle Office of CNR. At that meeting Defendant COLLEGE distributed employment contracts to the staff and Plaintiff was the only person at that meeting who was not offered a contract and/or position with Defendant COLLEGE. Eliana Bront a Caucasian woman, Antonio Delgado a Caucasian male, Andy Baker a Caucasian male and David Gowey a Caucasian male were all in attendance at that meeting with Plaintiff and all but Plaintiff were offered employment positions with Defendant COLLEGE.

46.     Further, at this meeting on May 2, 2019, Defendant SOUTHARD showed the staff an offensive racially charged YouTube video of a Black woman in distress. Due to the offensive nature of this video, the open showing of the offensive video at a staff meeting and the fact that Defendant SOUTHARD was in a position of power at the institution, Plaintiff complained to Dr. Brian Johnson who at that time was Vice President of CNR. Plaintiff made his complaint to Dr. Johnson via text message and included a copy of the offensive video.

47.     In early August of 2019 CNR replaced Professor RODGERS with Antonio Delgado and Defendant SOUTHARD as Campus Director of the Brooklyn Campus. Mr. Delgado was previously an Assistant Professor of Liberal Arts and was supervised by Plaintiff. Mr. Delgado was moved into Plaintiff's former office under the supervision of Defendant SOUTHARD. Mr. Delgado, who is white, had significantly less experience than Plaintiff. However both Mr. Delgado and Defendant SOUTHARD assumed all the duties of the Campus Director, and signed off on all campus directives.

48.     Other than Defendant SOUTHARD, Professor RODGERS was the most senior person working as Campus Director, having worked for the previous twenty two (22) years with CNR and in the position of Campus Director for the previous seven (7) years. Not only was Plaintiff removed and replaced from his Campus Director position, but all of the other Campus Directors, who were all Caucasian, were transferred over to Defendant MERCY COLLEGE.

49.     The Caucasian Campus Directors who were transferred to, and retained employment with, Defendant COLLEGE were: Eliana Bront, Campus Director of New Rochelle; Andy Baker, Campus Director of Harlem; Arlene Hogan, Campus Director of Co-Op City; and David Gowey, Campus Director of South Bronx.

50.     Due to Defendants' racial animus, Professor RODGERS was the only Campus Director not extended an offer to continue his employment with Defendant COLLEGE, even though he was Campus Director of the largest and most populous of the campuses. Furthermore, Plaintiff trained all the other Campus Directors.

51.     Moreover, Plaintiff trained all but one (1) of the Caucasian faculty members, all but one (1) of the non-White faculty members, and one (1) of the three Caucasian administrators Defendant COLLEGE selected to transfer from CNR. All the faculty members selected to transfer were either not a Black person or was younger than Plaintiff and had less work experience than Plaintiff.

52.     Defendant COLLEGE, being well aware of Plaintiff's standing and trust with the student body of CNR, waited until after student registration to inform Plaintiff that he would not be transitioned into Defendant COLLEGE. Defendants, in an effort to retain as much of the existing CNR student body as possible and after publicly announcing their promise to retain all administrative

staff, denied Plaintiff's continued employment for no other reason than their racial animus, racial discrimination and in retaliation for Plaintiff speaking out against the racist actions of Defendant COLLEGE's employee SOUTHARD. The calculated timing of this decision was made to maximize the financial gain of Defendant COLLEGE while simultaneously ridding themselves of Plaintiff.

53. Defendants were well aware that as Campus Director of the South Bronx and Brooklyn Campuses, the students entrusted Plaintiff with guidance as they made their life decisions, and in particular their decisions as to whether or not to continue their education with Defendant COLLEGE.

54. Plaintiff was personally responsible for the registration of at least one hundred (100) students. According to Defendant COLLEGE's website, the tuition for enrolling for one year at Defendant COLLEGE is $21,358, not including expenses such as books, room and board. U.S. News & World Report calculates the actual yearly cost per student, including expenses at Defendant COLLEGE to be $39,530 per year.

55. Utilizing Defendant COLLEGE's own financial data, one hundred (100) students represents $2,135,800 in revenue per year. Once Plaintiff secured the delivery of these funds to Defendant COLLEGE through the registration of students, Plaintiff was then informed his employment was no longer wanted or needed for reasons having nothing to do with his work performance or contributions to CNR or Defendant COLLEGE.

56. Rather, Plaintiff was denied a transfer to, and wrongfully terminated by, Defendant COLLEGE due to collective Defendants' animus regarding Plaintiff's race.

57. This Complaint is filed in light of the adverse employment actions taken to impact, affect and alter the terms and conditions of Plaintiffs' employment, including but not limited to his

unwarranted termination. The actions of collective Defendants MERCY COLLEGE, DR. JOSE

HERRERA, TIMOTHY HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD, each one

of them included unresponsiveness, insensitivity, retaliation and violation of the laws referenced

below.

58.     The wrongful treatment to which Plaintiff has been subjected and the harm caused

by that treatment is on going.

**AS AND FOR A FIRST COUNT**
**42 U.S.C. §1981 of the Civil Rights Act of 1866**

59.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 58

inclusive of this Complaint, with the same force and effect as though herein fully set forth.

60.     The above discriminatory acts based on Plaintiff's race and color, and retaliation for

opposing discriminatory practices by Defendants COLLEGE, DR. JOSE HERRERA, TIMOTHY

HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD violate 42 U.S.C. § 1981.

61.     During a staff meeting on or about May 2, 2019 Defendant DR. SOUTHARD

displayed a racially offensive video to her staff which on that date was comprised of approximately

seven (7) other staff members, including Plaintiff and one (1) other African American.

62.     DR. SOUTHARD, who is White, repeatedly used the "n word". DR. SOUTHARD

repeatedly and clearly spoke the "n word" to her audience and/or constantly repeated the word in a

manner in which the audience would hear the derogatory and offensive word.

63.     Upon information and belief, on the morning of May 2, 2019, Defendant MERCY

COLLEGE oversaw the day-to-day operations of CNR, although there was yet to be an official

announcement of the transition of staff and faculty of The COLLEGE. On that date Defendant

15

SOUTHARD held a staff meeting at the New Rochelle Office of CNR. At that meeting Defendant COLLEGE distributed employment contracts to the staff and Plaintiff was the only person at that meeting who was not offered a contract and/or position with Defendant COLLEGE. Elena Bront a Caucasian woman, Antonio Delgado a Caucasian male, Andy Baker a Caucasian male and David Gowey a Caucasian male who were in attendance at that meeting with Plaintiff all were offered employment positions with Defendant COLLEGE.

64.     Further, at this meeting Defendant SOUTHARD showed the staff an offensive racially charged YouTube video of a Black woman in distress. Due to the offensive nature of this video, the open showing of the offensive video at a staff meeting and the fact that Defendant SOUTHARD was in a position of power at the institution, Plaintiff complained to Dr. Brian Johnson who at that time was Vice President of CNR. Plaintiff made his complaint to Dr. Johnson via text message and included a copy of the offensive video.

65.     In August of 2019, CNR replaced Professor RODGERS with Antonio Delgado and Defendant SOUTHARD as Campus Director of the Brooklyn Campus. Mr. Delgado, who is white,  was previously an Assistant Professor of Liberal Arts and was supervised by Plaintiff. Mr. Delgado was moved into Plaintiff's former office under the supervision of Defendant SOUTHARD. Mr. Delgado had significantly less experience than Plaintiff. However both Mr. Delgado and Defendant SOUTHARD assumed all the duties of the Campus Director, and signed off on all campus directives.

66.     Professor RODGERS was the most senior person working as Campus Director, having worked for the previous twenty two (22) years with CNR and in the position of Campus Director for the previous seven (7) years. Not only was Plaintiff removed and replaced from his

Campus Director position, but all of the other Campus Directors, who were all Caucasian, were transferred over to Defendant MERCY COLLEGE.

67.    The Caucasian Campus Directors who were transferred to, and retained employment with, Defendant COLLEGE were: Eliana Bront, Campus Director of New Rochelle; Andy Baker, Campus Director of Harlem; Arlene Hogan, Campus Director of Coop City; and David Gowey, Campus Director of South Bronx.

68.    Professor RODGERS was the only Campus Director not extended an offer to resume his employment with Defendant COLLEGE, even though he was Campus Director of the largest, most populous of the campuses and trained the other Directors.

69.    Furthermore, Plaintiff trained all but one (1) of the Caucasian faculty members, all but one (1) of the non-White faculty members, and one (1) of the three Caucasian administrators Defendant COLLEGE selected to transfer from CNR.

70.    Plaintiff has been discriminated against, due to his race and color in violation of 42 U.S.C. § 1981 and Plaintiff has been subjected to discrimination due to his race and color in that he was forced to work in an extremely hostile environment, was subjected to micro and macro-aggressions and demeaned by DEFENDANT SOUTHARD. Plaintiff was stripped of his title, demoted, suffered loss of pay, loss of career and the ignominy of termination by DEFENDANTS. At all times relevant to this Complaint PLAINTIFF was qualified for his position and treated as though he was not qualified due to his race and color.

71.    Defendants COLLEGE, DR. JOSE HERRERA, TIMOTHY HALL and WILLIAM LATIMER all deliberately discriminated against Plaintiff by allowing Defendant DR. KRISTINE SOUTHARD to harass, retaliate, and discriminate against Plaintiff based upon race and color and/or

17

opposition to the discriminatory acts and then Defendants COLLEGE, DR. JOSE HERRERA, TIMOTHY HALL and WILLIAM LATIMER retaliated and discriminated against Plaintiff by terminating him.

72.     That by reason of the foregoing, Plaintiff RODGERS is now suffering and will continue to suffer irreparable injury and monetary damages, has been subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars per Plaintiff, as well as costs and attorney's fees.

## AS AND FOR A SECOND COUNT
### TITLE VI. 42 U.S.C.2000Cd)

73.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 72 of this Complaint with the same force and effect as though fully set forth herein.

74.     Upon information and belief, Defendant COLLEGE receives federal financial assistance and funds earmarked primarily for its educational programs.

75.     The COLLEGE, at all times relevant, is a private not-for-profit entity that receives and utilizes federal funds and assistance in the conducting of its functions within the County of Westchester, State of New York. Such federal funds include but are not limited to federal aid received through Federal Financial Aid programs and Federal Work Study Programs. These federal funds were issued to help students afford the tuition and expenses of Defendant COLLEGE, and are paid to Defendant COLLEGE.

76.     The above described discriminatory practices based on race and retaliation for opposing discriminatory practices by Defendant COLLEGE, their agents and employees violates

Title VI of the 1964 Civil Rights Act and 42 U.S.C. § 2000 (d).

77.     Defendant COLLEGE through their agents and employees and by the conduct set forth above have harassed, intimidated and retaliated against Plaintiff, in violation of Title VI, for opposing discriminatory practices, which include but are not limited to, removing Plaintiff from his duties as Campus Director and terminating Plaintiff for no reason other than Defendants' animus towards Plaintiff's race and color.

78.     As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of pay and other employment benefits and has suffered and continues to suffer distress, humiliation, embarrassment, psychological trauma requiring professional treatment, great financial expense and damage to his reputation.

79.     That by reason of the foregoing, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, has been and continues to be subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and thus, has been damaged in excess of five million ($5,000,000) dollars, as well as costs and attorney's fees.

## AS AND FOR A THIRD COUNT
## BREACH OF CONTRACT

80.     Plaintiff repeats and reiterate the allegations set forth in paragraphs 1 through 79 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

81.     Defendant COLLEGE extended an offer of employment to Plaintiff, which carried with it the implied promises that Plaintiff would be treated fairly and in good faith, and not discriminated against due to his race and/or color, nor retaliated against during the course of his

19

employment with the Defendants.

82.     At the time of hire, Plaintiff was induced into accepting employment with Defendant COLLEGE in lieu of pursuing and accepting other employment opportunities. Throughout the course of his employment, Plaintiff was further induced into continuing his employment with the Defendants, based in substantial part on the Defendants' specific promises and assurances (oral and express) that they would not discriminate or retaliate against the Plaintiff, with respect to his employment conditions. Said promises and the employment agreement thus constituted an employment contract, and created a duty of good faith and fair dealings on the part of Defendants.

83.     Defendants' implied promises and employment contract carried a duty to terminate the Plaintiff only in good faith, and further carried a duty not to discriminate against Plaintiff based on his race and/or color, nor in retaliation for opposing discriminatory practices.

84.     The Plaintiff performed in an above satisfactory manner throughout the duration of his employment with The College of New Rochelle prior to the transition with Defendant COLLEGE. However, despite Plaintiff's exemplary work history, Defendants discriminatorily terminated him from employment.

85.     That by reason of the foregoing, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, has been and continues to be subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars, as well as costs and attorney's fees.

## AS AND FOR A AS AND FOR A FOURTH COUNT
## NYS EXECUTIVE LAW §296 (PENDENT STATE LAW CLAIM)

86.     Plaintiff repeats and reiterate the allegations set forth in paragraphs 1 through 85 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

87.     Defendants The COLLEGE, together with their agents, servants and employees, acting collectively and individually, discriminated against the Plaintiff in his employment, via denied opportunities for advancement, inequitable pay, hostile work environment, unequal terms and conditions and discriminatory and retaliatory termination of employment, as set forth in the preceding paragraphs.

88.     Defendants COLLEGE, DR. JOSE HERRERA, TIMOTHY HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD together with their agents, servants and employees, acting collectively and individually, through the actions and conduct set forth in the preceding paragraphs, did aid and abet one another in permitting, condoning, and helping to execute the aforesaid pattern and practice, by Defendant COLLEGE of race retaliation based discrimination in employment, denial of career advancement and job opportunities, a hostile work environment, and unequal terms and conditions of employment as visited upon Plaintiff.

89.     All of the aforementioned Defendants lacked any business reason or justification for their aforesaid disparate treatment of Plaintiff, and instead subjected Plaintiff to the above described adverse employment actions, based upon Plaintiffs race and color and in retaliation for Plaintiffs filing of Internal Complaints, grievances and charges of discrimination, opposing discrimination, and voicing speech of public concern.

90.    Here, Defendants COLLEGE, DR. JOSE HERRERA, TIMOTHY HALL, WILLIAM LATIMER and DR. KRISTINE SOUTHARD through their agents and employees and by the conduct set forth above have harassed, intimidated and retaliated against Plaintiff, in violation of New York's Executive Law §296 for opposing discriminatory practices, which include but are not limited to, preventing Plaintiff from performing his duties as Campus Director and terminating Plaintiff.

91.    As a direct result of said acts, Plaintiff Professor TIMOTHY RODGERS has suffered and continues to suffer loss of income, loss of other employment benefits, loss of career opportunities, and has suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to his reputation, and the emotional and psychological trauma as asserted in the preceding paragraphs of this Complaint.

92.    As a result of Defendants unlawful acts, Plaintiff is entitled to the maximum monetary damages and penalties available by law, including all compensatory damages available under NYS Executive Law Section 296.

93.    Because of Plaintiff's race and color and opposition to discriminatory practices, he has been subjected to abuse and mistreatment as detailed above and has been treated differently than other similarly situated individuals in that Plaintiff has been stripped of his position and terminated because of his race and color and his opposition to discriminatory practices.

94.    That by reason of the foregoing, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, has been and continues to be subjected to economic losses and emotional injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public

humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000) dollars, as well as costs and attorney's fees.

## PRAYER FOR RELIEF

Wherefore, based on the foregoing, Plaintiffs request judgment as follows:

a.    First Count: in excess of five million ($5,000,000) dollars as well as other damages, costs and attorney's fees.

b.    Second   Count: in excess of five million ($5,000,000) dollars as well as other damages, costs and attorney's fees.

c.    Third  Count: in excess of five million ($5,000,000) dollars per plaintiff as well as punitive damages, costs and attorney's fees.

d.    Fourth Count: in excess of five million ($5,000,000) dollars as well as other damages, costs and attorney's fees.

e.    Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes;

f.    A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

g.    Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

h.    An Order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated:  Hempstead, New York
        August 16, 2023

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____
     ALBERT D. MANUEL
     Attorneys for Plaintiffs
     556 Peninsula Boulevard
     Hempstead, New York  11550
     (516) 489-6959