UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIMOTHY RODGERS,<br><br>Plaintiff,<br><br>- against -<br><br>MERCY COLLEGE, DR.  JOSE HERRERA, TIMOTHY HALL, DR.  KRISTINE SOUTHARD, and WILLIAM LATIMER,<br><br>Defendants. | Civil Action No.<br>23-cv-7278 (LGS)<br><br><br>**DEFENDANTS MERCY COLLEGE, DR. JOSE HERRERA, AND TIMOTHY HALL'S REPLY STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1 IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendants Mercy College ("Mercy"), Dr. Jose Herrera, and Timothy Hall (collectively, the "Mercy Defendants"), by their attorneys, Venable LLP, submit the following reply statement of material facts for which they contend there is no genuine issue to be tried.

**A. Mercy College and Its Relevant Administrators**

1.     Mercy College (now Mercy University) is a New York-based institution of higher education with campuses in Westchester, Manhattan, and the Bronx. [1]

Plaintiffs Response:

**Not Disputed.**

2.     Mercy is a minority-serving institution, serving first generation students of color. (WL Tr: 14:14-23).

---

[1] https://www.mercy.edu/about

Plaintiffs Response:

**Not Disputed.**

      3.     Mr. Timothy Hall ("Mr. Hall") was President of Mercy from 2014 through 2023. (TH Tr: 11:24 – 12:11;[2] Declaration of Timothy L. Hall in Support of the Mercy Defendants' Motion for Summary Judgment ("Hall Decl."), ¶ 1).

Plaintiffs Response:

**Not Disputed.**

      4.     Dr. Jose Herrera was Provost and Vice President of Academic Affairs ("VPAA") of Mercy from 2017 through 2021. (JH Tr: 14:11-24, 25:4-7). [3]

Plaintiffs Response:

**Not Disputed.**

      5.     As Provost and VPAA, Dr. Herrera was the chief academic officer overseeing the academic enterprise at Mercy, from curriculum to student complaints. (JH Tr: 25:13-18).

Plaintiffs Response:

**Not Disputed.**

      6.     Dr. Herrera was involved in the hiring of faculty insofar as he made final approvals based on recommendations by department heads, the search committee, and deans. (JH Tr: 26:10-16, 27:14-18).

Plaintiffs Response:

**Not Disputed.**

---

[2] A copy of the Deposition Transcript of Timothy Hall (cited to herein as "TH Tr:") is attached to the Declaration of Allison B. Gotfried in Support of the Mercy Defendants' Motion for Summary Judgment (the "Gotfried Declaration") as **Exhibit A**.

[3] A copy of the Deposition Transcript of Dr. Jose Herrera (cited to herein as "JH Tr:") is attached to the Gotfried Declaration as **Exhibit B**.

7.      Dr. Brian Johnson ("Dr. Johnson"), an African American man, was Vice President of the Manhattan campus at Mercy. (Pl. Tr: 66:24 – 67:2, 67:8-10, 88:18-25, 89:7-9; Declaration of Brian Johnson, PhD in Support of the Mercy Defendants' Motion for Summary Judgment ("Johnson Decl."), ¶¶ 1, 11).

Plaintiffs Response:

**Not Disputed.**

8.      As Vice President of Mercy's Manhattan campus, Dr. Johnson's responsibilities included, among other things, leading campus strategy, assisting with campus enrollment and marketing, developing educational programs, delivering student services, directing campus initiatives, cultivating and soliciting donors, developing relationships with community members, and supervising and growing the campus. (Johnson Decl., ¶ 2).

Plaintiffs Response:

**Not Disputed.**

**B.      Plaintiff Timothy Rodgers and His Employment at the College of New Rochelle**

9.      Plaintiff identifies as African American. (Pl. Tr: 10:19-23)

Plaintiffs Response:

**Not Disputed.**

10.      Plaintiff was initially employed as an adjunct instructor at the College of New Rochelle ("CNR"). (Pl. Tr: 26:12-19).[4]

Plaintiffs Response:

**Not Disputed.**

---

[4] A copy of the Deposition Transcript of Plaintiff Timothy Rodgers (cited to herein as "Pl. Tr:") is attached to the Gotfried Declaration as **Exhibit C**.

11.     Subsequently, Plaintiff became an Assistant Professor of Liberal Arts at CNR, a position he held through the end of his employment at CNR. (Pl. Tr: 26:20 – 27:15, 31:3-20).

Plaintiffs Response:

 Not Disputed.

12.     In or around January 2013, Plaintiff became Acting Campus Director of CNR's South Bronx Campus. (Pl. Tr: 28:9-16).

Plaintiffs Response:

Not Disputed.

13.     Plaintiff was then appointed as Campus Director of the South Bronx campus of CNR, and, finally Campus Director of the Brooklyn campus. (Pl. Tr: 28:20 – 29:4, 29:7-13).

Plaintiffs Response:

Not Disputed.

14.     Campus Directors at CNR were responsible for the physical campus and the campus's academic operations. (KS Tr: 43:21 – 44:3).

Plaintiffs Response:

Not Disputed.

15.     As Campus Director, Plaintiff's supervisor was Dr. Kristine Southard ("Dr. Southard"), who also supervised two associate deans, an assistant dean, and the other campus directors. (Pl. Tr: 30:21 – 31:2; KS Tr: 25:25 – 26:20, 27:5-8, 36:2-5, 36:11-21).

Plaintiffs Response:

Not Disputed.

16.    In or around May 2019, Dr. Southard showed her executive team, including Plaintiff, Elena Bronte, Andrew Baker, Donna Tyler, David Goewey, and Arlene Hogan a video at a meeting. (Pl. tr: 113:15 – 114:6).

Plaintiff's Response:

**Disputed in Part.**

The video was racially offensive.

17.    At the time Dr. Southard showed this video, she was not an employee of Mercy. (Pl. Tr: 115:24 – 116:2).

Plaintiffs Response:

**Not Disputed.**

18.    Plaintiff was terminated from his employment at CNR effective in August 2019. (Pl. Tr: 31:21 – 32:2, 34:20-25, 129:2-8; KS Tr: 50:20 – 51:9, 52:11-15). Plaintiff alleged in his Verified Complaint with the New York State Division of Human Rights ("NYSDHR Verified Complaint") that his last day of work was on August 8, 2019. (NYSDHR Verified Complaint, Defts_0173; Pl. Tr: 34:20-25).

Plaintiffs Response:

**Not Disputed.**

19.    Plaintiff was the only African American Campus Director at CNR during his employment. (Pl. Tr: 70:5-8).

Plaintiffs Response:

**Not Disputed.**

**C.      The College of New Rochelle and its Relationship with Mercy**

20.      Beginning April 2018, Dr. William Latimer ("Dr. Latimer") was the President of CNR, responsible for overseeing the operations of the college, its academic programs, and finances. (WL Tr: 9:2-21).[5]

Plaintiffs Response:

**Not Disputed.**

21.      Dr. Southard was the Dean of the School of New Resources at CNR. (KS Tr: 20:18 – 21:3). [6]

Plaintiffs Response:

**Not Disputed.**

22.      CNR was experiencing an ongoing financial crisis that was severely impacting its operations and would result in its imminent insolvency. (Agreement of Mutual Cooperation, Defts_0001, Defts_0002).[7]

Plaintiffs Response:

**Not Disputed.**

23.      As a result, CNR forecasted that it could be closing and was looking to partner with another college or university to enter into a teach-out arrangement. (TH Tr: 48:2-9).

Plaintiffs Response:

**Not Disputed.**

---

[5] A copy of the Deposition Transcript of Dr. William Latimer (cited to herein as "WL Tr:") is attached to the Gotfried Declaration as **Exhibit D**.

[6] A copy of the Deposition Transcript of Dr. Kristine Southard (cited to herein as "KS Tr:") is attached to the Gotfried Declaration as **Exhibit E**.

[7] A copy of the Agreement of Mutual Cooperation (Defts_0001 – Defts_0010) is attached to the Gotfried Declaration as **Exhibit F**.

24.     The purpose of a teach-out arrangement is to provide reasonable avenues for students of a failing or closing institution to pursue their education at another institution of higher education in an uninterrupted manner. (Teach-Out Agreement, Defts_0031).[8]

Plaintiffs Response:

**Not Disputed.**

25.     In Fall 2018, Mercy and CNR, through Dr. Latimer and Mr. Hall, began discussions regarding entering into a teach-out agreement. (TH Tr: 49:15 – 50:4, 50:6-11).

Plaintiffs Response:

**Not Disputed.**

26.     On or around December 8, 2018, Mercy and CNR entered into a Memorandum of Understanding, wherein they agreed to work together toward an exclusive teach-out relationship. (Memorandum of Understanding, Defts_0681 – Defts_0692;[9] Agreement of Mutual Cooperation, Defts_0001).

Plaintiffs Response:

**Not Disputed**.

27.     On or around January 18, 2019, CNR and Mercy entered into a Teach-Out Agreement, whereby Mercy represented that it would permit all or most of CNR's students to enroll at Mercy under similar terms as their education experience at CNR. (Teach-Out Agreement, Defts_0031 – Defts_0043; TH Tr: 48:10-20, 52:25 – 53:9; Mercy's Response to the NYSDHR Verified Complaint, TRODGERS00003710[10]).

---

[8] A copy of the Teach-Out Agreement Between Mercy College and The College of New Rochelle (Defts_0031 - Defts_0043) is attached to the Gotfried Declaration as **Exhibit G**.
[9] A copy of the Memorandum of Understanding (Defts_0681 - Defts_0692) is attached to the Gotfried Declaration as **Exhibit H**.
[10] A copy of Mercy's Response to the NYSDHR Verified Complaint (TRODGERS000036 – TRODGERS000039) is attached to the Gotfried Declaration as **Exhibit I**.

Plaintiffs Response:

**Not Disputed**

28.    On or around March 4, 2019, CNR and Mercy entered into an Agreement of Mutual Cooperation which set forth the terms of their relationship to ensure that CNR's students would have a seamless transition to Mercy. (Mercy's Response to the NYSDHR Verified Complaint, TRODGERS000037; Agreement of Mutual Cooperation, Defts_0001 – Defts_0010).

Plaintiffs Response:

**Not Disputed**

29.    Mercy's goal in this relationship was two-fold: (1) teach out all or most of the CNR students (i.e., allow them to graduate under comparable terms as they had at CNR) and (2) ensure it had the faculty it needed to cover the CNR students transitioning to Mercy and the increasing number of students that would come enroll at Mercy as a result of the transitioned CNR programs. (TH Tr: 60:2-25, 61:10-23, 75:9-18; see generally Agreement of Mutual Cooperation, Defts_0001 – Defts_0003).

Plaintiffs Response:

**Not Disputed**

30.    In other words, the central mission of Mercy during this transition was to make the process smooth and to create the conditions of success for students who came from CNR to Mercy. (TH Tr: 67:21 – 68:7, 77:3-14).

Plaintiffs Response:

**Not Disputed**

31.    CNR students did not begin attending Mercy until after August 10, 2019. (TH Tr: 76:12-16).

Plaintiffs Response:

**Not Disputed**

32.     However, the process for Mercy hiring faculty from CNR began in Summer 2019, as Mercy needed to confirm that it had the faculty it needed for the influx of students beginning in the Fall 2019 semester. (TH Tr: 79:3-13).

Plaintiffs Response:

**Not Disputed**

33.     Plaintiff never saw any agreement between Mercy and CNR, nor was he involved in the drafting or negotiation of any of these agreements. (Pl. Tr: 39:4-6, 42:6-19).

Plaintiffs Response:

**Not Disputed**

34.     In April 2019, CNR disseminated a Worker Adjustment and Retraining Notification ("WARN") letter to all CNR employees notifying them of a likely layoff and answering questions regarding the layoff. (CNR WARN Letter, Defts_0045 – Defts_0046; WL Tr: 22:16-19, 23:5-8, 24:7-12).[11]

Plaintiffs Response:

**Not Disputed**

35.     Plaintiff received this letter. (Pl. Tr: 32:10-12, 32:23-24, 33:11-13, 33:21-22).

Plaintiffs Response:

**Not Disputed**

36.     In August 2019, CNR closed its doors. (Pl. Tr: 38:10-11; WL Tr: 22:4-14; Mercy's Response to NYSDHR Verified Complaint, TRODGERS000037).

---

[11] A copy of the CNR WARN Letter (Defts_0045 – Defts_0046) is attached to the Gotfried Declaration as **Exhibit J**.

Plaintiffs Response:

**Not Disputed**

37.     As a result, every employee at CNR lost their job. (WL Tr: 22:4-14, 24:2-6, 24:17-20, 36:13-23, 36:24 – 37:7, 80:10-24; KS Tr: 51:23-25).

Plaintiffs Response:

**Not Disputed**

38.     The nature and parameters of the relationship between CNR and Mercy is fully set forth in the Memorandum of Understanding, the Teach-Out Agreement, and the Agreement of Mutual Cooperation. (Memorandum of Understanding, Defts_0681 – Defts_0692; Agreement of Mutual Cooperation, Defts_0001 – Defts_0010; Teach-Out Agreement, Defts_0031 – Defts_0043).

Plaintiffs Response:

**Not Disputed**

39.     For one year after CNR closed, Mercy leased some of CNR's campuses to facilitate an easier transition for students. (TH Tr: 69:3-9).

Plaintiffs Response:

**Not Disputed**

40.     Mercy did not merge with, acquire, purchase, or in any other way take control of CNR. (Mercy's Response to NYSDHR Verified Complaint, TRODGERS000037; Hall Decl., ¶ 2).

Plaintiffs Response:

**Not Disputed**

41.     Mercy did not continue CNR's operations. (Hall Decl., ¶ 3).

Plaintiffs Response:

**Not Disputed**

42.     Mercy did not purchase CNR's physical locations. (Hall Decl., ¶ 4).

Plaintiffs Response:

**Not Disputed**

43.     Mercy did not assume any responsibility for any issues or matters associated with CNR's operations, closure, disposition of assets, financial aid responsibilities, debt, financial obligations, legal requirements related to closure, or any other matters associated with CNR's operations and/or closure. (Teach-Out Agreement, Defts_0032 – Defts_0033; Hall Decl., ¶ 5).

Plaintiffs Response:

**Not Disputed**

**D.     Mercy's Hiring and Employment of Faculty and Staff from CNR**

44.     In implementing the teach-out arrangement, Mercy only needed to hire the CNR faculty and staff necessary to ensure that the approximately 1,800 CNR students transitioning to Mercy could complete their degrees. (Mercy's Response to the NYSDHR Verified Complaint, TRODGERS000037).

Plaintiffs Response:

**Not Disputed**

45.     To assess the quantity and coverage needed, Mercy analyzed the student population and the academic programs transitioning from CNR, assessed its current faculty and staff, and then made offers to CNR faculty and staff for one-year contracts only to fill any gaps in Mercy's

already-existing personnel roster. (Mercy's Response to the NYSDHR Verified Complaint, TRODGERS000038; KS Tr: 39-21 – 42:7, 79:18 – 80:14).

Plaintiffs Response:

**Not Disputed**

46.     This strategy aligned with the need to be conscious of the overwhelming expense the teach-out arrangement placed on Mercy, which required it to be judicious about its additional hiring costs. (WL Tr: 25:5-24; Mercy's Response to NYSDHR Verified Complaint, TRODGERS000038; Plaintiff's Rebuttal to the NYSDHR Verified Complaint, TRODGERS000040[12] (noting "the Teach-out agreement was costly to Mercy College")).

Plaintiffs Response:

**Not Disputed**

47.     The Teach-Out Agreement does not state that Mercy would hire all personnel employed by CNR. (Pl. Tr: 42:3-5; Teach-Out Agreement, Defts_0031 – Defts_0043).

Plaintiffs Response:

**Not Disputed**

48.     The Agreement of Mutual Cooperation does not state that Mercy would hire all personnel employed by CNR. (Pl. Tr: 41:4-13).

Plaintiffs Response:

**Not Disputed**

49.     In fact, it only stated that Mercy committed to "the engagement or employment of certain personnel. . ." (Agreement of Mutual Cooperation, Defts_0003) (emphasis added).

---

[12] A copy of Plaintiff's Rebuttal to the NYSDHR Verified Complaint (TRODGERS000040 – TRODGERS000041) is attached to the Gotfried Declaration as **Exhibit K**.

Plaintiffs Response:

**Disputed in part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

50.    It further stated that "Mercy shall retain sole discretion over which, if any, personnel employed by CNR it shall offer employment to or otherwise to engage in a non-employment capacity." (Agreement of Mutual Cooperation, Defts_0004) (emphasis added).

Plaintiffs Response:

**Disputed in part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

51.    In a February 15, 2019 public press release, Mercy stated only that it "hope[d] to retain many of the CNR faculty."[13]

Plaintiffs Response:

**Not Disputed**

---

[13] https://www.mercy.edu/news-events/news/finalized-agreement-college-new-rochelle-and-mercy

52.    On February 22, 2019, CNR, through Dr. Latimer, sent an announcement to the members of its community informing them of its significant financial challenges and its potential partnership with a separate educational institution. (February 22, 2019 Announcement, Latimer_0005 – Latimer_0006).[14]

Plaintiffs Response:

**Not Disputed**

53.    Nothing in the February 22, 2019 Announcement stated that Mercy would be hiring all CNR employees, including Plaintiff. (Pl. Tr: 44:6-13).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

54.    In fact, in acknowledgment of the fact that neither the arrangement between the entities nor the hiring decisions had been finalized, the February 22, 2019 Announcement stated that the arrangement "may necessitate the retention of a number of faculty and staff." (February 22, 2019 Announcement, Latimer_0005) (emphasis added).

Plaintiffs Response:

**Not Disputed**

---

[14] A copy of the February 22, 2019 Announcement (Latimer_0005 – Latimer_0006) is attached to the Gotfried Declaration as **Exhibit L**.

55.    On February 25, 2019, Mr. Hall sent a letter to the Mercy community reinforcing CNR's February 22, 2019 Announcement. (February 25, 2019 Letter, Defts_0044[15]).

Plaintiffs Response:

**Not Disputed**

56.    Nothing in the February 25, 2019 Letter stated that Mercy would be hiring all CNR employees, including Plaintiff. (Pl. Tr: 45:9-14; February 25, 2019 Letter, Defts_0044).

Plaintiffs Response:

 **Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

57.    In fact, in further acknowledgment of the fact that neither the arrangement between the entities nor the hiring decisions had been finalized, the Letter stated, "[t]o help minimize disruption to the CNR students, Mercy expects to be able to offer employment to some CNR faculty and staff." (February 25, 2019 Letter, Defts_0044) (emphasis added). In early March 2019, Mr. Hall sent another letter to the Mercy community explaining the agreement between CNR and Mercy. (March 2019 Letter, Defts_0272[16]).

Plaintiffs Response:

**Disputed in Part.**

---

[15] A copy of the February 25, 2019 Letter (Defts_0044) is attached to the Gotfried Declaration as **Exhibit M**.
[16] A copy of the March 2019 Letter (Defts_0272) is attached to the Gotfried Declaration as **Exhibit N**.

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

58.    Nothing in the March 2019 Letter stated that Mercy would be hiring all CNR employees, including Plaintiff. (Pl. Tr: 46:9-15; March 2019 Letter, Defts_0272).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

59.    In a March 2019 press release, Mercy stated to the public that "Mercy hopes to retain many of the CNR faculty. . ." (March 2019 Press Release, Defts_0344 – Defts_0346[17]).

Plaintiffs  Response

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain

---

[17] A copy of the March 2019 Press Release (Defts_0345 – Defts_0346) is attached to the Gotfried Declaration as **Exhibit O**.

with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

60.     In a Questions & Answer session with CNR community members in or around February 2019, Mr. Hall addressed potential employment of CNR faculty and staff during the teach-out. (Latimer and Hall Q&A, Defts_0260 – Defts_0271[18]).

Plaintiffs Response:

**Not Disputed**

61.     In doing so, Mr. Hall represented, "I'm just going to be honest and say that it's not likely that it will be 100%. I don't know quite what it would entail, but I do know that we will need CNR faculty and staff to serve the students. How many and where and what capacities will depend partially upon how many students choose to remain." (Latimer and Hall Q&A, Defts_0264).

Plaintiffs Response:

**Not Disputed**

62.     In or around March 2019, Dr. Herrera conducted a meeting with CNR employees, including Plaintiff, Eric Bekoe, Andy Baker, Elena Bronte, and Michael Anker. (Pl. Tr: 81:13-25).

Plaintiffs Response:

**Not Disputed**

63.     At that meeting, Dr. Herrera never specifically stated that Plaintiff would be hired by Mercy. (Pl. Tr: 80:7-24, 90:11-17, 90:23-24, 102:16-18, 102:22-24).

Plaintiffs Response:

Disputed in Part.

---

[18] A copy of the Latimer and Hall Q&A Transcript (Defts_0260 – Defts_0271) is attached to the Gotfried Declaration as **Exhibit P**.

At that meeting, Dr. Herrera called Plaintiff into the meeting along with some of his colleagues. The director of human resources was additionally present at this meeting. Dr. Herrera explained to Plaintiff and the group with Plaintiff that they were "always going to be brought on board" and the "contracts [were] being prepared but they were not ready at the time of this meeting" but if they were they would have had them all signed at that meeting. Plaintiff left feeling assured that he had a job at Mercy College as any reasonable objective person would. (Rogers Deposition Transcript 80:7-24).

64.     Nor did Dr. Herrera state with the details of any contracts that may be prepared for the CNR staff that would be hired by Mercy. (Pl. Tr: 102:5-7).

Plaintiffs Response:

**Disputed in part.**

Plaintiff understood them to mean written contracts and everyone at that meeting was hired except for Plaintiff. (Rogers Deposition Transcript : 102:5-15)

65.     In fact, Dr. Herrera, in his administrative role, ratified recommendations brought to him by department heads and deans regarding the hiring of faculty from CNR but was not responsible for hiring staff from CNR to Mercy. (JH Tr: 29:1-7, 29:11-21, 34:9-24, 36:8-16, 38:18-25, 39:13-20).

Plaintiffs Response:

**Not Disputed**

66.     The April 8, 2019 CNR WARN Letter did not promise employment at Mercy for all CNR employees. (CNR WARN Letter, Defts_0045 – Defts_0046).

Plaintiffs Response:

**Not Disputed**

67.      Instead, it stated that "Mercy may hire some of CNR's employees; however, details on such hiring have not yet been developed," and that "a limited number of CNR employees may be hired by Mercy College." (CNR WARN Letter, Defts_0045) (emphasis added).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074). 68. As part of this transition, Mr. Hall requested that he speak with faculty, staff, and students of CNR to discuss what Mercy was proposing for its arrangement with CNR. (TH Tr: 55:23 – 56:14).

Plaintiffs Response:

**Not Disputed**

69.      In or around April 2019, staff, students, and faculty of the CNR Brooklyn campus met with some administrators of Mercy, including Dr. Hall. (Pl. Tr: 106:15-21, 107:7-12, 110:23-25; WL Tr: 63:12-21).

Plaintiffs Response:

**Not Disputed**

70.      During that meeting, Mr. Hall addressed the transition of some CNR faculty to Mercy but stated that Mercy would hire faculty and staff as needed to serve the unknown number of CNR students that would transition to Mercy. (TH Tr: 98:2-7, 98:19 – 99:5, 99:21 – 100:5).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

71.     Dr. Herrera, who was present at this April 2019 meeting, affirmed that Mr. Hall did not openly promise to the attendees that all CNR administrators and faculty would transition to employment at Mercy. (JH Tr: 50:12 – 51:4, 52:12). Dr. Johnson, who was also present at this meeting, affirmed Mr. Hall never made representations about any CNR employee's future employment with Mercy. (Johnson Decl., ¶ 9).

Plaintiffs Response:

**Not Disputed**

72.     In a separate meeting in or around April 2019, staff, students, and faculty of the CNR South Bronx campus met with Mercy administrators, including Mr. Hall. (Pl. Tr: 107:14-21).

Plaintiffs Response:

**Not Disputed**

73.     Mr. Hall does not recall any CNR students raising concerns about specific CNR faculty, including Plaintiff, moving to Mercy at any meeting. (TH Tr: 83:9-13, 85:19 – 86:2, 99:21 – 100:5).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

74.    Stating that Plaintiff would be employed by Mercy would have been "contrary to what [Mr. Hall] believed at the time." (TH Tr: 106:11-15).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

75.    In fact, Mr. Hall did not know Plaintiff at that time. (TH Tr: 106:21-25; JH Tr: 26:24 – 27:2).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain

with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

76.    Indeed, any promises regarding employment of CNR employees by Mercy would not have made sense, as, at the time, the arrangement between Mercy and CNR was not yet final, and the two entities were still in the process of discussing which students would transition to Mercy. (JH Tr: 51:4-5; WL Tr: 63:22 – 64:5, 64:7-18; TH Tr: 99:6-12).

Plaintiffs Response:

**Not Disputed**

77.    Dr. Southard, who was present at these meetings, confirmed that neither Dr. Latimer or Mr. Hall stated that CNR faculty, staff, and administrators were guaranteed jobs at Mercy. (KS Tr: 88:16-21).

Plaintiffs Response:

**Not Disputed**

78.    Further, Mercy never anticipated hiring all CNR faculty, and was not guaranteeing that all CNR faculty and staff would be hired by Mercy. (TH Tr: 83:14-23, 84:2-14).

Plaintiffs Response:

**Not Disputed**

79.    Accordingly, Mr. Hall was very careful in his messaging to ensure that students and faculty understood that Mercy was not bringing over all CNR faculty, but rather hiring CNR faculty as needed based on the transitioning students. (TH Tr: 86:3-8).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hall of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hall said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

80.    Nothing in the April 8, 2019 CNR WARN Letter stated that Mercy would be hiring all or any specific CNR employees or groups of CNR employees, including Plaintiff. (Pl. Tr: 47:7-12, 47:23-25, 48:2-4).

Plaintiffs Response:

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting held at Brooklyn Campus, President Timothy Hill of Mercy College and New Rochelle President William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hill said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

81.    Mercy never employed all former CNR staff and faculty from any particular academic department or program. (Hall Decl., ¶ 6).

Plaintiffs Response:

**Not Disputed**

82.    Plaintiff does not know whether Mercy hired all of CNR's other employees, and does not know everyone who was hired by Mercy as a result of the teach-out arrangement. (Pl. Tr: 42:20-23, 55:14-16). Plaintiff believes Mercy hired no other African Americans from CNR.

(Pl. Tr: 65:18 – 66:23, 70:9-15, 134:9-16). Plaintiff believes other CNR employees were "offered a contract" at some point in or around May 2019. (Pl. Tr: 126:5 – 129:2).

Plaintiffs Response:

**Not Disputed**

83.     Dr. Latimer was hired by Mercy as the Vice President of its Bronx campus beginning August 2019. (WL Tr: 7:25 – 8:12, 53:17-19; TH Tr: 57:20 – 58:6).

Plaintiffs Response:

**Not Disputed**

84.     In this role, Dr. Latimer oversaw the goals, activities, and day-to-day operations of the Bronx campus and was responsible for the equivalent duties of a campus director for part of the CNR students who transitioned to Mercy. (WL Tr: 8:13-25, 19:4-17; TH Tr: 57:25 – 58:6, 58:13-20).

Plaintiffs Response:

**Not Disputed**

85.     In or around late-August 2019, Dr. Southard, who had more experience than Plaintiff, was mailed a one-year contract to be the Director of the New Resources Program at Mercy, in which she was responsible for aiding students in the transition, ensuring that student records had properly transferred, and leading the administrative team of the New Resources Program. (KS Tr: 21:11-19, 21:24 – 23:6, 27:9-13, 39:16 – 42:7, 50:13-15; Pl. Tr: 63:5-64:4).

Plaintiffs Response:

**Not Disputed**

86. After learning about the potential teach-out arrangement, Dr. Southard never received the impression that she was guaranteed a job at Mercy. (KS Tr: 39-21 – 42:7, 87:23 – 88:10).

Plaintiffs Response:

**Not Disputed**

87. Of the 217 faculty and staff members hired by Mercy in 2019, 109 (i.e., 50.2%) identified as African American. (List of 2019 Faculty and Staff Hired by Mercy, Defts_0457 – Defts_0459[19]).

Plaintiffs Response:

**Not Disputed**

**E.    Mercy Did Not Hire Plaintiff**

88. Plaintiff never applied for a position at Mercy. (Pl. Tr: 35:13-15).

Plaintiffs Response:

**Disputed in part.**

Plaintiff did not have to apply for a position at Mercy. President Hall and President Lattimier told student Gerard Johnson along with other students, that Director Rodgers would remain with Mercy College along with other staff. (Rodgers bs 000073-000074).

89. Plaintiff was not hired by Mercy. (Pl. Tr: 43:7-13).

Plaintiffs Response:

**Not Disputed**

90. Plaintiff never received a written offer of employment of any kind from Mercy, including an employment agreement or offer letter. (Pl. Tr: 36:8-10, 36:15-17, 77:18-25, 78:8-10,

---

[19] A copy of the List of 2019 Faculty and Staff Hired by Mercy (Defts_0457 – Defts_0459) is attached to the Gotfried Declaration as **Exhibit Q**.

102:5 – 103:8, 103:14 – 104:2, 105:15-17, 112:23 – 113:2; Plaintiff's NYSDHR Verified

Complaint Rebuttal, TRODGERS000041).

<u>Plaintiffs Response:</u>

**Not Disputed**

91.    Plaintiff never spoke with anyone at Mercy for written confirmation of his

employment. (Pl. Tr: 128:23 – 129:2).

<u>Plaintiffs Response:</u>

**Not Disputed**

92.    Plaintiff never signed a document regarding employment at Mercy. (Pl. Tr: 78:11-

13).

<u>Plaintiffs Response:</u>

**Not Disputed**

93.    Plaintiff was never employed by Mercy, never performed work for Mercy, and was

never paid by Mercy. (Pl. Tr: 35:2-12, 87:22-24).

<u>Plaintiffs Response:</u>

**Not Disputed**

94.    While Plaintiff claims to have received an oral offer of prospective employment

with Mercy, such oral offer did not include a term or duration of employment, a specific title or

role, or compensation. (Pl. Tr: 77:21-25, 78:2-4, 98:7-14, 100:15-25).

<u>Plaintiffs Response:</u>

**Disputed in Part.**

Mercy did not practice or followed the Agreement of Mutual Cooperation, at a student meeting

held at Brooklyn Campus, President Timothy Hill of Mercy College and New Rochelle President

William Lattimier when asked by CNR student Gerard Johnson, would Director Rodgers remain with Mercy College. President Hill said that the Director Rodgers would remain Campus Director along with other staff. President Lattimier endorsed that statement . (Rodgers-bs 000073-000074).

95. Plaintiff's only "acceptance" of this oral offer was "an applause and a thank you" while sitting in a large group setting. (Pl. Tr: 78:2-4).

Plaintiffs Response:

**Not Disputed**

96. No one told Plaintiff that if he satisfied certain conditions, he would be employed at Mercy. (Pl. Tr: 129:12-19).

Plaintiffs Response:

**Not Disputed**

97. When asked how he relied on the purported offer of employment at Mercy to forgo other opportunities, Plaintiff admitted that in or around 2019, he applied to a Director of Curriculum position at New York University, but unilaterally withdrew the application because the responsibilities would be unfamiliar territory and he preferred to be with his students and staff at Mercy. (Pl. Tr: 80:5-24, 84:19-25, 86:2 – 87:5).

Plaintiffs Response:

**Not Disputed**

98. Plaintiff did not apply to one other position he considered—a role with John Jay School of Criminal Justice—because it was too late to apply. (Pl. Tr: 87:6-10).

Plaintiffs Response:

**Not Disputed**

99.    Plaintiff does not know if an individual at Mercy made the decision not to hire him, or who that individual would have been. (Pl. Tr: 95:9-15).

Plaintiffs Response:

**Not Disputed**

100.    Plaintiff never spoke with Dr. Herrera directly about his employment at Mercy. (Pl. Tr: 81:9-12, 102:19-21, 128:10-17).

Plaintiff's Response:

**Disputed.**

Dr.Herrera and Plaintiff had a meeting regarding Plaintiff's future employment at Mercy college. At that meeting, Dr. Herrera called Plaintiff into the meeting along with some of his colleagues. The director of human resources was additionally present at this meeting. Dr. Herrera explained to Plaintiff and the group with Plaintiff that they were "always going to be brought on board" and the "contracts [were] being prepared but they were not ready at the time of this meeting" but if they were they would have had them all signed at that meeting. Plaintiff left feeling assured that he had a job at Mercy College as any reasonable objective person would. (Rogers Deposition Transcript 80:7-24).

101.    When asked how Dr. Herrera was involved in Mercy's decision not to hire Plaintiff, Plaintiff responded "I can't explain that." (Pl. Tr: 135:10-12).

Plaintiffs Response:

**Not Disputed**

102.    Dr. Herrera did not reject a recommendation or proposal for Mercy to hire any individual faculty member from CNR. (JH Tr: 41:2-9, 54:21-24).

Plaintiffs Response:

**Not Disputed**

103.    Dr. Herrera did not reject an application by Plaintiff for employment with Mercy. (JH Tr: 54:25 – 55:3).

Plaintiffs Response:

**Not Disputed**

104.    Plaintiff never spoke with Mr. Hall directly about his employment with Mercy. (Pl. Tr: 112:9-11, 128:19-22).

Plaintiffs Response:

**Not Disputed**

105.    Mr. Hall's limited involvement regarding the hiring of staff and faculty from CNR to Mercy was to hire Dr. Latimer as Vice President and to make decisions regarding nursing staff. (TH Tr: 56:15 – 57:11, 106:16-20, 111:11-18).

Plaintiffs Response:

**Not Disputed**

106.    Mr. Hall was not otherwise involved in hiring specific faculty from CNR. (TH Tr: 62:8-18).

Plaintiffs Response:

**Not Disputed**

107.    Mr. Hall never made or was involved in a decision not to hire Plaintiff. (TH Tr: 113:14-16); (Hall Decl., ¶ 7).

Plaintiffs Response:

**Not Disputed**

108.    When asked how Mr. Hall was involved in Mercy's decision not to hire Plaintiff, Plaintiff responded "I can't explain that." (Pl. Tr: 135:7-15).

Plaintiffs Response:

**Not Disputed**

109.    Dr. Southard did not recommend, or offer her opinion on, CNR faculty and administrators in the transition to Mercy. (KS Tr: 33:21 – 34:25, 35:2-6, 35:9-13, 71:7-13, 72:4-21, 84:13-24).

Plaintiffs Response:

**Not Disputed**

110.    Plaintiff admits that no Mercy employee ever talked to him about his race or made a racially derogatory comment toward him. (Pl. Tr: 62:23-25, 63:2-4).

Plaintiffs Response:

**Not Disputed**

111.    When asked if Dr. Herrera engaged in discrimination against him, Plaintiff responded, "I'm not sure how it played out that I didn't get a contract. . . after he said that I would." (Pl. Tr: 140:4-15).

Plaintiffs Response:

**Not Disputed**

112.    In discussing why he named Mr. Hall as a defendant in his Complaint, Plaintiff did not state that Mr. Hall engaged in any discrimination. (Pl. Tr: 140:16-22).

Plaintiffs Response:

**Disputed in Part.**

Plaintiff stated that at two town hall meetings Dr. Hall specifically stated that Timothy Rogers would transition to Mercy as campus director in the presence of maybe 50 students or more, faculty and staff. (Rogers Deposition Transcript, 140:16-22)

113.    Regardless, Plaintiff admits that he did not file a lawsuit against Mercy because of how a particular person treated him. (Pl. Tr: 62:8-11.)

Plaintiffs Response:

**Disputed.**

The question asked of Plaintiff was "Are you suing Mercy because of how a particular person treated you during....". The question was not whether Plaintiff was suing because of how a particular person treated him at all.

114.    At his deposition, when Plaintiff was asked "what makes you think that you were not hired by Mercy because of your race?" Plaintiff responded "I can't answer that question." (Pl. Tr: 68:19-21).

Plaintiffs Response:

**Disputed in Part.**

Plaintiff later stated, "Because I wasn't hired. I was not even offered a position, and my work was exemplary throughout my entire tenure at the college." (Rogers deposition transcript, 69:4-11.)

115.    When pressed further, Plaintiff stated "because I can't think of anything else it would have been due to." (Pl. Tr: 69:25 – 70:4).

Plaintiffs Response:

**Disputed.**

Upon further pressing the interaction went:
    Q: Sure, you're claim here is that you weren't hired because of your race, correct?
    A: Yes.
    Q: What makes you think that?

A: Because I wasn't hired. I was not even offered a position, and my work was exemplary throughout my entire tenure at the college

Q: What does that have to do with your race?

A: With all due respect, it's unfortunate that you can't see that. (Rogers deposition transcript, 69:4-15.)

116.    Notably, Mercy also did not extend an offer of employment to Arlene Hogan, who was another Campus Director at CNR, and is an individual outside of Plaintiff's protected racial category. (List of School of New Resources-CNR Individuals, Defts_0389[20]).

Plaintiffs Response:

**Not Disputed**

**F.    Mercy Gives Brooklyn Campus Oversight Duties to its Current Employee, Brian Johnson**

117.    While Plaintiff believes that Dr. Southard was hired by Mercy as Campus Director of the Brooklyn campus, and Antonio Delgado as Assistant Campus Director, in fact, Dr. Johnson assumed these duties. (Pl. Tr: 136:7-19; TH Tr: 58:7-12; KS 27:9-13; 39-21 – 40:11; Johnson Decl., ¶¶ 3, 6, 5).

Plaintiffs Response:

**Not Disputed**

118.    Dr. Johnson identifies as African American. (TH Tr: 111:6-8; Johnson Decl., ¶ 11).

Plaintiffs Response:

**Not Disputed**

119.    Dr. Johnson had already been the Vice President of Mercy's Manhattan campus, and he was tasked with performing similar responsibilities for CNR's former Harlem and Brooklyn

---

[20] A copy of the List of School of New Resources-CNR Individuals (Defts_0389) is attached to the Gotfried Declaration as **Exhibit R**.

campuses and for the students from CNR who came to Mercy's Manhattan campus. (TH Tr: 58:7-12, 69:3-24; Johnson Decl., ¶¶ 1, 2, 5).

Plaintiffs Response:

**Not Disputed**

120.    Given the low projection of the number of CNR students continuing at the new temporary Mercy Brooklyn campus, the decision to maximize Mercy's current resources by absorbing oversight of the small Brooklyn campus into Dr. Johnson's responsibilities aligned with Mercy's objective to keep personnel costs arising from the teach-out arrangement minimal. (Mercy's Response to the NYSDHR Verified Complaint, TRODGERS000038; Johnson Decl., ¶ 4).

Plaintiffs Response:

**Not Disputed**

121.    Mr. Hall made the decision to add the responsibilities of managing the Brooklyn campus to Dr. Johnson's duties in the latter part of Spring 2019. (TH Tr: 110:10-14, 110:24 – 111:25 Johnson Decl., ¶ 3).

Plaintiffs Response:

**Not Disputed**

122.    Dr. Johnson was well-qualified to oversee the additional campuses. (TH Tr: 110:19-23).

Plaintiffs Response:

**Not Disputed**

123.    After his employment at Mercy, Dr. Johnson became the President of Warner Pacific University. (Mercy's Response to the NYSDHR Verified Complaint, TRODGERS000038; Johnson Decl., ¶ 10).

Plaintiffs Response:

**Not Disputed**

124.    In fact, no one who held the title of Campus Director at CNR transferred to Mercy as a Campus Director. (KS Tr: 76:10-15).

Plaintiffs Response:

**Not Disputed**

125.    Plaintiff admits that the job titles at CNR did not directly translate to job titles at Mercy because they were not operating under the same "schematic." (Pl. Tr: 83:14-18).

Plaintiffs Response:

**Not Disputed**

126.    There was no title of Campus Director at Mercy. (TH Tr: 108:6-9).

Plaintiffs Response:

**Not Disputed**

127.    At Mercy, the responsibilities of CNR Campus Directors went to Mercy's Vice Presidents. (TH Tr: 70:10-25, 108:6-17).

Plaintiffs Response:

**Not Disputed**

128.    The Mercy Vice Presidents helped manage the former CNR campuses at least through Summer 2020. (TH Tr: 70:10-25, 108:6-17).

Plaintiffs Response:

**Not Disputed**

**G. Procedural History**

129.    Plaintiff filed his NYSDHR Verified Complaint on or around August 7, 2020. (NYSDHR Verified Complaint, Defts_0172 – Defts_0176; Dismissal of the NYSDHR Verified Complaint, TRODGERS000061[21]).

Plaintiffs Response:

**Not Disputed**

130.    In the NYSDHR Verified Complaint, Plaintiff identified March 18, 2019 as the most recent date that discrimination occurred. (NYSDHR Verified Complaint, Defts_0172;[22] Pl. Tr: 50:13 – 51:2, 51:25 – 52:15).

Plaintiffs Response:

**Not Disputed**

131.    The NYSDHR Verified Complaint does not allege that Mercy's failure to hire him for a position was based on his race. (NYSDHR Verified Complaint, Defts_0176; Pl. Tr: 54:2-6).

Plaintiffs Response:

**Disputed.**

Plaintiff discussed race discrimination in his NYSDHR complaint and even wrote down lists of comparators. (NYSDHR COMPLAINT)

132.    Instead, Plaintiff only attributed Mercy's failure to hire him to his protected status of age. (NYSDHR Verified Complaint, Defts_0176; Pl. Tr: 54:2-6).

---

[21] A copy of the Dismissal of the NYSDHR Verified Complaint (TRODGERS000058 – TRODGERS000062) is attached to the Gotfried Declaration as **Exhibit S**.
[22] A copy of the NYSDHR Verified Complaint (Defts_0172 – Defts_0177) is attached to the Gotfried Declaration as **Exhibit T**.

Plaintiffs Response:

**Disputed.**

Plaintiff discussed race discrimination in his NYSDHR complaint and even wrote down lists of comparators. (NYSDHR COMPLAINT, NYSDHR REBUTTAL)

133.    Indeed, the only race discrimination allegation in the NYSDHR Verified Complaint is that Plaintiff, as a black administrator, was expected to do more work and produce more revenue than his colleagues at CNR. (NYSDHR Verified Complaint, Defts_0176; Pl. Tr: 54:7-19).

Plaintiffs Response:

**Disputed.**

Plaintiff detailed his race based discrimination claim in his NYSDHR Rebuttal.

134.    Plaintiff knew that Mercy did not hire him by the time he filed the NYSDHR Verified Complaint. (Pl. Tr: 56:12-21).

Plaintiffs Response:

**Not Disputed**

135.    Plaintiff never amended his NSYDHR Verified Complaint to include allegations of race discrimination against Mercy. (Pl. Tr: 60:6-7).

Plaintiffs Response:

Disputed.

Plaintiff's original NYSDHR complaint and his rebuttal detailed his race based discrimination. (NYSDHR COMPLAINT, NYSDHR REBUTTAL)

136.    On February 15, 2022, Plaintiff requested that the NYSDHR close his case for administrative convenience—after a finding of Probable Cause—so that he could pursue his claims

in federal court. (Dismissal of the NYSDHR Verified Complaint, TRODGERS000062, TRODGERS000068).

Plaintiffs Response:

**Not Disputed**

137.    On or around March 16, 2022, an administrative law judge with the New York State Division of Human Rights submitted a Recommended Order of Dismissal for Administrative Convenience. (Dismissal of NYSDHR Complaint, TRODGERS000058 – TRODGERS000062).

Plaintiffs Response:

**Not Disputed**

138.    On or around April 8, 2022, the New York State Division of Human Rights adopted the administrative law judge's Recommended Order and issued a Notice and Final Order Case 1:23-cv-07278-LGS Document 135 Filed 03/03/25 dismissing the

NYSDHR Verified Complaint. (Dismissal of the NYSDHR Verified Complaint, TRODGERS000063).

Plaintiffs Response:

**Not Disputed**

139.    Plaintiff filed the instant complaint in the Southern District of New York on August 16, 2023 ("Complaint" or "Compl."). (ECF Docket Entry No. 1).

Plaintiffs Response:

**Not Disputed**

## PLAINTIFF'S COUNTER STATEMENT OF FACTS

1.      Professor Timothy Rodgers identifies as an African American male. (Rodgers Dep. Tr. at p. 14:15-24)

        **Mercy Defendants' Response**: Admit, except aver that the portion of the deposition transcript cited to herein does not establish the fact asserted.

2.      Professor Rodgers was initially hired with College of New Rochelle as an Adjunct Instructor, teaching Urban Community for approximately twenty-two years. (Rodgers Dep. Tr. at pp. 25:20-26:16

        **Mercy Defendants' Response**: Admit, except aver that the portion of the deposition transcript cited to herein does not establish the fact asserted with respect to the length of time Plaintiff taught "Urban Community."

3.      Professor Rodgers was the only African American Administrator in the College of New Rochelle prior to the transition to Mercy College. (Rodgers Dep. Tr. at p. 14:4-21)

        **Mercy Defendants' Response**: Deny.  In the Plaintiff's Southern District of New York Complaint (ECF Docket Entry No. 1), Plaintiff alleges that he was one of two "Black Administrators at The College of New Rochelle."  *See* Complaint, ECF Docket Entry No., 1, ¶ 18.  Plaintiff confirmed this fact during his deposition.  (Pl. Tr: 87:25 – 88:2-8).

4.      Professor Rodgers remained an Adjunct instructor for the College of New Rochelle for two years. (Rodgers Dep. Tr. at p. 26:15-19).

        **Mercy Defendants' Response**: Admit.

5.      On or about January of 2013, Professor Rodgers underwent a change of title and was promoted to Assistant Professor of Liberal Arts where he taught several courses within the Urban Community curriculum. (Rodgers Dep. Tr. at pp. 26:20-27:15)

**Mercy Defendants' Response**: Admit in part, deny in part. According to Plaintiff's career timeline at his deposition, Plaintiff became an Assistant Professor of Liberal Arts in the early 2000s. (Pl. Tr: 26:17-25 – 27:2-15 (stating that he was Assistant Professor "up to" January '13")). The Mercy Defendants otherwise admit that Plaintiff became Assistant Professor of Liberal Arts at CNR, where he taught several courses within the Urban Community curriculum.

6.    Following the promotion to Assistant Professor of Liberal Arts, Professor Rodgers became the Acting Campus Director for approximately three years in the South Bronx Campus at the College of New Rochelle. (Rodgers Dep. Tr. at pp. 28:9-29:9)

**Mercy Defendants' Response**: Admit.

7.    Approximately after four years in the role of Acting Campus Director at the Bronx Campus, Professor Rodgers received an offer letter from the College of New Rochelle for the position for Campus Director of the Brooklyn Campus. (Rodgers Dep. Tr. at pp. 29:14-30:6)

**Mercy Defendants' Response**: Admit in part, deny in part. Immediately after holding the title of Acting Campus Director at the South Bronx campus, Plaintiff became Campus Director for the South Bronx campus. After approximately four years of being in the *Campus Director* role at South Bronx campus, Plaintiff became the Campus Director of the Brooklyn Campus. (Pl. Tr: 28:9-25 – 29:2-17). The Mercy Defendants otherwise admit that Plaintiff received an offer letter for his campus director roles. (Pl. Tr: 29:18-25 – 30:2-6).

8.    The President of the College of New Rochelle, Mr. William Latimer, expressed Professor Rodgers possessed significant experience and tenure in the role of Campus Director for the College of New Rochelle. (Latimer Dep. Tr. at pp. 9:2-13, 29:8-30:7).

**Mercy Defendants' Response**: Admit in part, deny in part. Dr. Latimer testified that it was his "sense" that Plaintiff "had a pretty significant tenure" as Campus Director at CNR, but did not state the word "experience." (WL Tr: 29:8-23) He further indicated that he did not know all the details, and did not know the length of Plaintiff's tenure. (WL Tr: 30:2-7).

9.    Professor Rodgers was the only African American Campus Director employed at the College of New Rochelle. (Rodgers Dep. Tr. at p. 70:5-17)

**Mercy Defendants' Response**: Admit.

10.   Professor Rodgers later became aware of the financial difficulties of the College of New Rochelle and the likelihood that the college may close. (Rodgers Dep. Tr. at p. 38:3-11)

**Mercy Defendants' Response**: Admit.

11.   Due to the foreseen closure of the College of New Rochelle, Mercy College reached out and came to an agreement with the College of New Rochelle concerning their students to transfer to Mercy College and complete their education. (Rodgers Dep. Tr. at pp. 38:12-39:3).

**Mercy Defendants' Response**: Admit in part, deny in part. CNR, not Mercy, initiated the search for a partner with which it could enter into a teach-out agreement. (TH Tr: 48:2-9). The agreements entered into between Mercy and CNR did not necessarily state that all CNR students would be able to transfer to Mercy and complete their education. (*See, e.g.,* Teach-Out Agreement, Defts_0031 – Defts_0043; TH Tr: 48:10-20, 52:25 – 53:9; Mercy's

Response to the NYSDHR Verified Complaint, TRODGERS000037; Agreement of Mutual Cooperation, Defts_0001 – Defts_0010).

12.     After the being informed that the College of New Rochelle President, Mr. Latimer, was hired and offered employment at Mercy College, Professor Rodgers was later offered a position within Mercy College. (Rodgers Dep. Tr. at pp. 42:20-43:10)

**Mercy Defendants' Response**: Admit in part, deny in part.  Dr. Latimer was hired by Mercy as Vice President of its Bronx campus.  (WL Tr: 7:25 – 8:12, 53:17-19; TH Tr: 57:20 – 58:6).  However, he was not hired by Mercy or offered employment until August 2019.  *See id.*  The portion of the deposition transcript cited to herein does not establish the fact that Plaintiff was offered a position with Mercy *after* being informed that CNR hired Dr. Latimer.  (*See* Pl. Tr: 42:20-25 – 43:2-10).  Plaintiff's own testimony belies this fact. Plaintiff alleges to have been offered a position with Mercy in or around March or April 2019 (*See, e.g.,* Pl. Tr: 97:11 – 100:25; 110:16 – 112:6).  However, Dr. Latimer was hired by Mercy in August 2019.  (WL Tr: 7:25 – 8:12, 53:17-19; TH Tr: 57:20 – 58:6). Nevertheless, as set forth more fully in the Mercy Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, Plaintiff was *never* offered a position with Mercy, nor was he hired by Mercy.  *See*, Mercy Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, Section G, and citations therein.

13.     In addition to the offer of a position, Professor Rodgers was given a verbal confirmation by both Jose Herrera, Provost of Mercy College,  and Timothy Hall, President of Mercy College,  for a contract of employment from Mercy College. (Rodgers Dep. Tr. at p. 77:2-17)

**Mercy Defendants' Response**: Deny.  As stated in response to Plaintiff's Statement of Fact No. 12, Plaintiff was not offered a position with Mercy.  Further, in the deposition testimony to which Plaintiff cites herein, Plaintiff merely testifies that he purportedly received a "verbal confirmation that [he] would be brought on board" by Dr. Herrera and Mr. Hall, not that he received verbal confirmation of a contract.  (Pl. Tr: 77:15-17).  Plaintiff never received a written offer of employment of any kind from Mercy, including an employment agreement or offer letter.  (Pl. Tr: 36:8-10, 36:15-17, 77:18-25, 78:8-10, 102:5 – 103:8, 103:14 – 104:2, 105:15-17, 112:23 – 113:2; Plaintiff's NYSDHR Verified Complaint Rebuttal, TRODGERS000041).  Plaintiff never signed a document regarding employment at Mercy.  (Pl. Tr: 78:11-13).  Plaintiff was never employed by Mercy, never performed work for Mercy, and was never paid by Mercy.  (Pl. Tr: 35:2-12, 87:22-24).  While Plaintiff claims to have received an oral offer of prospective employment with Mercy, such oral offer did not include a term or duration of employment, a specific title or role, or compensation.  (Pl. Tr: 77:21-25, 78:2-4, 98:7-14, 100:15-25).  Dr. Herrera did not reject a recommendation or proposal for Mercy to hire any individual faculty member from CNR.  (JH Tr: 41:2-9, 54:21-24).  Dr. Herrera did not reject an application by Plaintiff for employment with Mercy.  (JH Tr: 54:25 – 55:3).  Mr. Hall was not involved in hiring specific faculty from CNR.  (TH Tr: 62:8-18).  Mr. Hall never made or was involved in a decision not to hire Plaintiff.  (TH Tr: 113:14-16); (Hall Decl., ¶ 7).  It is well-established that plaintiff's own testimony cannot create a genuine issue of material fact where that testimony is self-serving, incomplete, contradictory, or "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief

necessary to credit the allegations." *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005).

14.   On or about April of 2019, a meeting at Town Hall, hosted by Dr. Hall and Dr. Herrera, was held assuring both students and faculty members that they all would transfer to Mercy College. Professor Rodgers again relied on a position at Mercy College would be offered. (Rodgers Dep. Tr. at pp. 106:7-19, 142:2-11)

**Mercy Defendants' Response**: Deny.   The portion of the deposition transcript cited to herein does not establish the fact asserted.   Plaintiff testified that Mr. Hall and Dr. Herrera allegedly stated that "staff and faculty" would transition to Mercy upon CNR's closing. (Pl. Tr: 107:22-25 – 108:2-17, 142:2-11).   Nevertheless, Mr. Hall, Dr. Herrera, and other attendees at the meeting deny that Mr. Hall and Dr. Herrera ever made such a statement. (TH Tr: 98:2-7, 98:19 – 99:5, 99:21 – 100:5, 106:11-15; JH Tr: 50:12 – 51:4, 52:12; Johnson Decl., ¶ 9; KS Tr: 88:16-21).   Further, Plaintiff's testimony refutes that Plaintiff relied "on a position at Mercy College would be offered." [sic].   Instead, Plaintiff testifies that there were opportunities available to him that *he* chose not to take because *he wanted* to continue at Mercy, *not* because he was relying on an offer by Mercy.   (Pl. Tr: 84:7-18). Specifically, Plaintiff states that he applied for a position of Director of Curricula at New York University.   (Pl. Tr: 84:24-25).   Plaintiff then unilaterally withdrew this application because "it seemed like it was going to be unfamiliar territory" and he "felt much more comfortable being.. . .with [his] students and with [his] staff and faculty who [were] transition to Mercy." (Pl. Tr: 86:13-25 – 87:2-5).   Despite initially claiming that he applied to a position at John Jay School of Criminal Justice (Pl. Tr: 85:19-21), Plaintiff then confirmed that he waited too long to apply, and the position was closed.   (Pl. Tr: 87:6-10).

15.     Regrettably, despite the promise of a position with Mercy College, Professor Rodgers was never officially offered a position and worked his last day on or about August 8, 2019. (Rodgers Dep. Tr. at p. 53:11-20)

**Mercy Defendants' Response**:  Admit in part, deny in part.  As set forth more fully in the Mercy Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, Plaintiff was *never* promised a position with Mercy, nor was he hired by Mercy. *See*, Mercy Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, Section G, and citations therein.  In fact, this statement of fact curiously confirms that Plaintiff was "*never* officially offered a position" with Mercy, despite previous statements of fact.  Mercy Defendants admit that Plaintiff's last day of employment *with CNR* was in August 2019.

16.     Professor Rodgers asserts the reason he was not offered a position was based on racial discrimination as he was treated differently being the only African American Administrator not offered a position of employment at Mercy College. (Rodgers Dep. Tr. at p. 54:2-11)

**Mercy Defendants' Response**: Deny.  This statement of fact is merely an allegation, and not appropriate for a Rule 56.1 Statement.  Nevertheless, while Mercy Defendants aver that this allegation forms the basis of Plaintiff's claims, Mercy Defendants deny that they engaged in racial discrimination. *See* Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, Sections E and F, and citations therein.  Further, this statement of fact curiously confirms that Plaintiff "*was not offered* a position" with Mercy, despite previous statements of fact.

17.     Professor Rodgers later confirmed with the previous Vice President of the College of New Rochelle, Brian Johnson, clarifying that Professor Rodgers was the only employee of color

not offered a position at Mercy College. Confirming Professor Rodgers release of employment was raced based. (Rodgers Dep. Tr. at p. 65:18-66:20)

**Mercy Defendants' Response**: Deny.  This statement of fact is merely an allegation, and not appropriate for a Rule 56.1 Statement.  Nevertheless, the portion of the deposition transcript cited to herein does not establish the fact asserted.  To begin, Brian Johnson was a Vice President at Mercy, not CNR.  Johnson Decl., ¶ 1.  Further, Plaintiff did not "clarify" or "confirm" anything with Dr. Johnson.  Instead, Plaintiff testified that he *told* Dr. Johnson that no African Americans were brought on to Mercy.  (Pl. Tr: 65:18-21).  He continued by stating that his statement to Dr. Johnson was that he "was the only black person.  Not everyone.  [He] was the only black person with more experience and more time and [he] was not offered a position."  (Pl. Tr: 66:15-23).  These were merely statements made about Plaintiff's belief about the situation, not confirmations of facts, nor does he testify that Dr. Johnson agreed with or confirmed same.

18.    Professor Rodgers relied on the offer of employment as it was proposed to him by the Provost and President of Mercy College. (Rodgers Dep. Tr. at p. 78:14-18)

**Mercy Defendants' Response**: Deny.  Plaintiff's testimony refutes that Plaintiff relied "on the offer of employment as it was proposed to him by the Provost and President of Mercy College." Instead, Plaintiff testifies that there were opportunities available to him that *he* chose not to take because *he wanted* to continue at Mercy, *not* because he was relying on an offer by Mercy.  (Pl. Tr: 84:7-18).  Specifically, Plaintiff states that he applied for a position of Director of Curricula at New York University.  (Pl. Tr: 84:24-25).  Plaintiff then unilaterally withdrew this application because "it seemed like it was going to be unfamiliar territory" and he "felt much more comfortable being.. . .with [his] students and

with [his] staff and faculty who [were] transition to Mercy." (Pl. Tr: 86:13-25 – 87:2-5). Despite initially claiming that he applied to a position at John Jay School of Criminal Justice (Pl. Tr: 85:19-21), Plaintiff then confirmed that he waited too long to apply, and the position was closed. (Pl. Tr: 87:6-10). Further, the Mercy Defendants aver that Plaintiff has previously posed as a statement of fact that he did *not* receive an offer of employment by Mercy. *See* Statements of Fact Nos. 15 and 16.

19.    The same offer of employment was presented to Professor Rodgers at a meeting where Dr. Herrera, Human Resources, fellow colleagues, and other members attended addressing the offer of employment to those of the College of New Rochelle. (Rodgers Dep. Tr. at p. 80:5-21)

**Mercy Defendants' Response**: Deny.  Plaintiff did not receive an offer of employment, and Plaintiff's previous statements of fact confirm same.  It is well-established that plaintiff's own testimony cannot create a genuine issue of material fact where that testimony is self-serving, incomplete, contradictory, or "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005).  Plaintiff never received a written offer of employment of any kind from Mercy, including an employment agreement or offer letter.  (Pl. Tr: 36:8-10, 36:15-17, 77:18-25, 78:8-10, 102:5 – 103:8, 103:14 – 104:2, 105:15-17, 112:23 – 113:2; Plaintiff's NYSDHR Verified Complaint Rebuttal, TRODGERS000041).  Plaintiff never signed a document regarding employment at Mercy.  (Pl. Tr: 78:11-13).  Plaintiff was never employed by Mercy, never performed work for Mercy, and was never paid by Mercy.  (Pl. Tr: 35:2-12, 87:22-24).  While Plaintiff claims to have received an oral offer of prospective

employment with Mercy, such oral offer did not include a term or duration of employment, a specific title or role, or compensation. (Pl. Tr: 77:21-25, 78:2-4, 98:7-14, 100:15-25). Dr. Herrera did not reject a recommendation or proposal for Mercy to hire any individual faculty member from CNR. (JH Tr: 41:2-9, 54:21-24). Dr. Herrera did not reject an application by Plaintiff for employment with Mercy. (JH Tr: 54:25 – 55:3). Mr. Hall was not involved in hiring specific faculty from CNR. (TH Tr: 62:8-18). Mr. Hall never made or was involved in a decision not to hire Plaintiff. (TH Tr: 113:14-16); (Hall Decl., ¶ 7).

20. Professor Rodgers left the meeting feeling assured he could rely on a permanent position with Mercy College based on the promise and assurance made by Dr. Herrera and Dr. Hall. (Rodgers Dep. Tr. at p. 80:5-23)

**Mercy Defendants' Response**: Deny. Mercy Defendants aver that the portion of the deposition transcript cited to herein does not establish the fact asserted. Instead, Plaintiff testifies that during this alleged meeting, Dr. Herrera (with no mention of Mr. Hall) purportedly said contracts were being prepared, and that if they had been ready, he would have had them all signed at the meeting. (Pl. Tr: 80:11-21). Plaintiff felt that he had a job at Mercy based on Dr. Herrera's alleged statement. However, Plaintiff did not testify to a "permanent" position, and Mercy Defendants deny that any promises and assurances were made regarding a position of employment for Plaintiff. (TH Tr: 98:2-7, 98:19 – 99:5, 99:21 – 100:5, 106:11-15; JH Tr: 50:12 – 51:4, 52:12; Johnson Decl., ¶ 9; KS Tr: 88:16-21). Additionally, Plaintiff then continues by undermining his own purported self-assurance. When asked if Dr. Herrera ever specifically told Plaintiff that he would have employment with Mercy during that meting, Plaintiff replied, "No." (Pl. Tr: 80:25 – 81:2-8).

21.     Following the discussion with Dr. Herrera, Professor Rodgers discovered everyone transitioned to employment with Mercy College; everyone except Professor Rodgers. (Rodgers Dep. Tr. at pp. 90:11-20, 93:10-94:8)

**Mercy Defendants' Response**:  Deny.  Mercy never employed all former CNR staff and faculty from any particular academic department or program.  (Hall Decl., ¶ 6).  To the extent Plaintiff is referring to everyone who was present at the purported meeting with Dr. Herrera, Ms. Hogan was not hired by Mercy. (List of School of New Resources-CNR Individuals, Defts_0389).

22.     At two separate Town Hall meetings, Dr. Hall stated Professor Rodgers would transfer to Mercy College as Campus Director in the presence of approximately fifty students, faculty and staff members. (Rodgers Dep. Tr. at p. 140:16-22)

**Mercy Defendants' Response**:  Deny.  Mr. Hall was not involved in hiring specific faculty from CNR.  (TH Tr: 62:8-18).  Mr. Hall never made or was involved in a decision not to hire Plaintiff.  (TH Tr: 113:14-16); (Hall Decl., ¶ 7). 74.     Stating that Plaintiff would be employed by Mercy would have been "contrary to what [Mr. Hall] believed at the time." (TH Tr: 106:11-15).  In fact, Mr. Hall did not know Plaintiff at that time.  (TH Tr: 106:21-25; JH Tr: 26:24 – 27:2).  Indeed, any promises regarding employment of CNR employees by Mercy would not have made sense, as, at the time, the arrangement between Mercy and CNR was not yet final, and the two entities were still in the process of discussing which students would transition to Mercy.  (JH Tr: 51:4-5; WL Tr: 63:22 – 64:5, 64:7-18; TH Tr: 99:6-12).    Further, Mercy never anticipated hiring all CNR faculty, and was not guaranteeing that all CNR faculty and staff would be hired by Mercy.  (TH Tr: 83:14-23, 84:2-14). 79.  Accordingly, Mr. Hall was very careful in his messaging to ensure that

students and faculty understood that Mercy was not bringing over all CNR faculty, but rather hiring CNR faculty as needed based on the transitioning students.  (TH Tr: 86:3-8). It is well-established that plaintiff's own testimony cannot create a genuine issue of material fact where that testimony is self-serving, incomplete, contradictory, or "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations."  *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005).

23.    Furthermore, a former employee of the College of New Rochell and Mercy College, Eric Beckoe, emailed Professor Rodgers his letter of support of the transition of employment to Mercy College. Resulting in Professor Rodgers asking for additional letters of support from his students Gerald Johnson,  Crystal Rollerson and Paulina Armstrong. President Lattimore and Dr. Hall answered in the affirmative. (Rodgers Dep. Tr. at pp. 146:6-24, 149:7-150:8)

**Mercy Defendants' Response:** Admit in part, deny in part.  Plaintiff received letters from Eric Bekoe, Gerard Johnson, Crystal Rollerson, and Paulina Armstrong.  However, these letters were a retelling of the events in the March 2019 and April 2019 meetings, and were not "of support of the transition of employment to Mercy College."  (Pl. Tr: 142:18 – 154:13).   Mercy Defendants cannot respond to the incomplete sentence "President Lattimore [sic] and Dr. Hall [sic] answered in the affirmative."

24.    Professor Rodgers did not seize any opportunities of employment with external employment proposals as he relied on the promised position with Mercy College as he sought to continue with his students and fellow colleagues from the College of New Rochelle at Mercy College. (Rodgers Dep. Tr. at p. 84:5-87:5)

**Mercy Defendants' Response**: Deny. Plaintiff's testimony refutes that Plaintiff relied "on the promised position with Mercy College." Instead, Plaintiff testifies that there were opportunities available to him that *he* chose not to take because *he wanted* to continue at Mercy, *not* because he was relying on an offer by Mercy. (Pl. Tr: 84:7-18). Specifically, Plaintiff states that he applied for a position of Director of Curricula at New York University. (Pl. Tr: 84:24-25). Plaintiff then unilaterally withdrew this application because "it seemed like it was going to be unfamiliar territory" and he "felt much more comfortable being.. . .with [his] students and with [his] staff and faculty who [were] transition to Mercy." (Pl. Tr: 86:13-25 – 87:2-5). Despite initially claiming that he applied to a position at John Jay School of Criminal Justice (Pl. Tr: 85:19-21), Plaintiff then confirmed that he waited too long to apply, and the position was closed. (Pl. Tr: 87:6-10). Further, the Mercy Defendants aver that Plaintiff has previously posed as a statement of fact that he did *not* receive a promise of employment by Mercy. *See* Statements of Fact Nos. 15 and 16.

25.    Due to discrimination based on race and color, Professor Rodgers found that offers of employment were solely given to Caucasian staff members to transition to Mercy College despite possessing supplemental time, tenure experience and exemplary work compared to those hired. (Rodgers Dep. Tr. at p. 63:5-9, 69:8-11)

**Mercy Defendants' Response**: Deny. This statement of fact is merely an allegation, and not appropriate for a Rule 56.1 Statement. Further, of the 217 faculty and staff members hired by Mercy in 2019, 109 (i.e., 50.2%) identified as African American. (List of 2019 Faculty and Staff Hired by Mercy, Defts_0457 – Defts_0459).

Dated:  April 25, 2025
        New York, New York

By:    /s/ Brian J.  Clark           

*Attorneys for Defendants Mercy College,*
*Dr. Jose Herrera and Timothy Hall*