UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                    :

TIMOTHY RODGERS,                          :

                                               :

                          Plaintiff,     :           23 Civ. 7278 (LGS)

              -against-            :

                                               :           **OPINION & ORDER**

MERCY COLLEGE et al.,              :

                                           :

                         Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Timothy Rodgers brings this action against Defendants Mercy College ("Mercy"), Dr. Jose Herrera and Timothy Hall, who are the remaining Defendants following a motion to dismiss. After Plaintiff withdrew his claim under Title VI of the Civil Rights Act of 1964, the surviving claims are: (a) discrimination against all three Defendants under 42 U.S.C. § 1981 and the New York State Human Rights Law ("NYSHRL") and (b) breach of contract against Mercy. Defendants move for summary judgment on all claims. For the following reasons, the motion is granted.

## I.     BACKGROUND

The following facts are drawn from the parties' statements pursuant to Federal Rule of Civil Procedure 56.1 and other submissions on Defendants' motion for summary judgment. All evidence is construed, and all reasonable inferences are drawn, in favor of Plaintiff as the non-moving party. *N.Y. State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

### A.     The Parties

Mercy is a minority-serving institution of higher education with campuses in Westchester, Manhattan and the Bronx.  During the relevant period, which was in 2019, Defendant Hall was President and Defendant Herrera was Provost and Vice President of Academic Affairs at Mercy.

Plaintiff identifies as Black.  He initially was Campus Director of the College of New Rochelle's ("CNR") South Bronx campus.  Later and during the first three quarters of 2019, Plaintiff was Campus Director of CNR's Brooklyn campus until he was fired in August 2019. CNR Campus Directors were responsible for the physical campus and its academic operations. Plaintiff was the only Black Campus Director at CNR during his employment there.[1]  There was only one other Black administrator at CNR, who retired, apparently leaving Plaintiff as the only Black administrator.

### B.     The Relationship Between CNR and Mercy

In 2018, CNR was experiencing a financial crisis that would result in its imminent insolvency and closure.  As a result, CNR sought to enter into an arrangement with Mercy to provide CNR students an opportunity to transfer to Mercy to continue their educations.  In the first quarter of 2019, Mercy and CNR entered into two agreements: (1) on January 18, 2019, the Teach-Out Agreement and (2) on March 4, 2019, the Agreement of Mutual Cooperation.  In the latter agreement, Mercy committed to "the engagement or employment of certain [CNR] personnel."  Mercy's goal in this arrangement was two-fold: (1) to allow all or most CNR

---

[1] Although he stated in the Complaint that there were no Black administrators at Mercy, Plaintiff clarified at his deposition that there were none at his level, and that the only Black administrator at Mercy was Brian Johnson, a Vice President.

students to graduate from Mercy and (2) to ensure that Mercy had the faculty needed to cover the CNR students who began attending Mercy after August 10, 2019.

Mercy needed to hire only the CNR faculty and staff necessary to accommodate the approximately 1,800 CNR students transitioning to Mercy.  To assess personnel needs, Mercy analyzed the student population, the academic programs transitioning from CNR and Mercy's existing resources.

### C.    Mercy's Interaction with Plaintiff

In around March 2019, Defendant Herrera (then Provost at Mercy) met with a group of CNR employees, including Plaintiff.  Herrera said that those employees were "always going to be brought on board" and the "contracts [were] being prepared but they were not ready at the time of this meeting," but had the contracts been ready, Herrera would have had them all signed at the meeting.

In April 2019, staff, students and faculty of the CNR Brooklyn campus met with some administrators of Mercy, including its then President, Defendant Hall, and Provost, Defendant Herrera.  In response to a student's question whether Plaintiff would remain Campus Director, Hall said that Plaintiff would.  Plaintiff construes this statement as an oral offer of employment, which Plaintiff accepted with "an applause and a thank you" while sitting with the CNR group.

Based on these assurances, Plaintiff did not apply for a position at Mercy, nor did he speak with anyone at Mercy to confirm or follow up on what he understood to be an offer. Mercy never made a written offer of employment to Plaintiff and did not hire Plaintiff.  Plaintiff believes that Mercy hired no Black employees from CNR.  Of the 217 faculty and staff members Mercy hired in 2019, 109 (i.e. 50.2%) identified as Black.

3

In April 2019, as CNR began to wind down, CNR sent to Plaintiff and all other CNR employees a Worker Adjustment and Retraining Notification letter (the "WARN Letter") notifying them of a likely layoff.

### D.    Mercy Assigns Brooklyn Campus Oversight Duties to Dr. Johnson

In late spring 2019, Defendant Hall decided that Dr. Brian Johnson would add to his responsibilities the duties of Campus Director of the former CNR Brooklyn campus as well as the former CNR Harlem campus.  Dr. Johnson identifies as Black.

Dr. Johnson was well-qualified to oversee the additional campuses.  When he assumed Plaintiff's previous duties, Dr. Johnson was already Vice President of Mercy's Manhattan campus and was responsible for, among other things, leading campus strategy and supervising the overall campus.  At Mercy, the duties of CNR Campus Directors were performed by Mercy Vice Presidents.  Mercy had no title of Campus Director.

The decision to absorb oversight of the Brooklyn campus into Dr. Johnson's responsibilities aligned with Mercy's objective to minimize personnel costs arising from the CNR arrangement, particularly given the low number of CNR students projected to attend the new temporary Mercy Brooklyn campus.  Mercy also did not hire Arlene Hogan.  Hogan, like Plaintiff, was a CNR Campus Director, but she does not identify as Black.

### E.    Mercy's Employment of CNR Personnel

In the summer of 2019, Mercy began hiring faculty from CNR to cover the influx of CNR students expected in the fall of 2019.  Mercy offered one-year contracts to certain CNR employees to fill gaps in Mercy's existing personnel roster.  In August 2019, CNR closed and discharged all of its employees, including Plaintiff.

F.     **Procedural History of New York State Complaint**

Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") on August 7, 2020, charging Mercy with employment discrimination.  In that complaint, Plaintiff identified March 18, 2019, as the "[d]ate most recent or continuing discrimination took place."

On February 15, 2022, Plaintiff asked the NYSDHR to close his case for administrative convenience so that he could pursue his claims in federal court.  On April 8, 2022, the NYSDHR dismissed his complaint.  Plaintiff commenced this action on August 16, 2023.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021).  "Summary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

party." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023).  "The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ."  *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019).  "[W]here a movant has shown the existence of a material fact and the nonmovant wishes to challenge it, the nonmovant bears the burden of production to point to significant probative evidence (that is, more than a scintilla of evidence) from which a reasonable factfinder could find for the nonmovant."  *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 413-14 (2d Cir. 2024), *unrelated certified question accepted*, 249 N.E.3d 37 (N.Y. 2024).  "Demonstrating that such issues exist requires the nonmovant to do more than simply show that there is some metaphysical doubt as to the material facts."  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).  The nonmovant cannot merely "deny the moving party's allegations in a general way," but instead "must present competent evidence that creates a genuine issue of material fact."  *Id.*

III.    DISCUSSION

A.      Discrimination Claims

Plaintiff's surviving discrimination claims are brought under 42 U.S.C. § 1981 and the NYSHRL.  Summary judgment is granted to Defendants on both claims.

1.      Section 1981

Summary judgment is granted to Defendants with respect to the § 1981 claim.  Section 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  This statute "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  *Patterson*

6

*v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *accord Rubert v. King*, No. 19 Civ. 2781, 2020 WL 5751513, at *6 (S.D.N.Y. Sep. 25, 2020).

> Section 1981 claims apply only to racial discrimination and require that the plaintiff allege facts supporting the following elements: (1) plaintiff is a member of a racial minority; (2) defendant's intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities, which include the rights to make and enforce contracts . . . .

*Gueye v. People's United Bank, Nat'l Ass'n*, No. 21 Civ. 1250, 2022 WL 2203953, at *1 n.1 (2d Cir. June 21, 2022) (summary order). "To prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020); *accord Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 848 (2d Cir. 2022). Section 1981 does not itself "specifically authorize[] private lawsuits to enforce" its prohibitions, but the Supreme Court has "created a judicially implied private right of action." *Comcast*, 589 U.S. at 333-34.

"[Section] 1981 . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing 411 U.S. 792, 802-04 (1973)); *accord Gueye*, 2022 WL 2203953, at *1. At the first step of the *McDonnell Douglas* framework, a plaintiff alleging discrimination bears the burden of establishing a prima facie case of discrimination. *Tolbert*, 790 F.3d at 435. To establish a prima facie case, a plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024); *accord Maxius v. Mount Sinai Health Sys. Inc.*, No. 21 Civ. 10422, 2024 WL 4166157, at *6 (S.D.N.Y. Sep. 12, 2024), *aff'd*, 2026 WL 178318 (2d Cir. Jan. 22, 2026). A plaintiff's burden of establishing a prima face case "is not onerous"

7

and "has been frequently described as minimal." *Banks*, 81 F.4th at 270.  At summary judgment, a plaintiff must "proffer[] admissible evidence show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Id.* at 272; *accord Maxius*, 2024 WL 4166157, at *6.

"Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  "The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment." *Id.*  "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.* Ultimately, the question is whether a reasonable jury could find, based on the evidence, that but for a plaintiff's race, he would have been hired.  *See Comcast*, 589 U.S. at 333-34; *Alexander v. Priv. Protective Servs., Inc.*, No. 24-853, 2025 WL 3083903, at *1-3 (2d Cir. Nov. 4, 2025) (summary order) (holding that a plaintiff failed to establish a triable case of race discrimination under § 1981 because, "[o]n these facts, no reasonable jury could conclude that [the plaintiff] was denied entry to the shoot [of a reality television show where he had been invited to work as an extra] because he is a Black man").

### a. Mercy

Plaintiff has met his prima facie burden for the § 1981 claim against Mercy.  The claim against Mercy rests on Mercy's failure to hire Plaintiff as part of the arrangement with CNR, allegedly due to Plaintiff's race.  Plaintiff's chief argument is that Mercy hired only White people from CNR, and specifically that Mercy hired the CNR administrators who are White (even those with less experience than Plaintiff), but did not hire Plaintiff, the only CNR administrator who is

Black.  Plaintiff's deposition to that effect meets the "minimal" burden of admissible evidence that could permit a rational jury to infer a discriminatory motive.  *Banks*, 81 F.4th at 270-72.

At the second step of the *McDonnell Douglas* analysis, Mercy has succeeded in "articulat[ing] some legitimate, nondiscriminatory reason for the disparate treatment."  *Vega*, 801 F.3d at 83.  There was no position of Campus Director at Mercy, and Vice Presidents performed the corresponding responsibilities.  Dr. Johnson was a Vice President at Mercy, was already performing those responsibilities at Mercy's Manhattan campus and was well qualified to assume those responsibilities for the former CNR Brooklyn campus.  Defendants explained that "the decision to maximize Mercy's current resources by absorbing oversight of the small [new and temporary] Brooklyn campus into Dr. Johnson's responsibilities aligned with Mercy's objective to keep personnel costs arising from the teach-out arrangement minimal."

At the third step of the *McDonnell Douglas* analysis, Plaintiff offers no evidence or argument that Mercy's reason for not hiring him is pretextual, and based on the evidence as a whole, no reasonable jury could find that, but for Plaintiff's race, he would have been hired.  As explained above, Mercy had no position of Campus Director; campus Vice Presidents handled those responsibilities.  No Campus Director at CNR transferred to Mercy as a Campus Director.  For example, Mercy did not extend an employment offer to Arlene Hogan, another Campus Director at CNR, who was not Black.  Ms. Hogan was present at a March 2019 meeting where Defendant Herrera "informed the attendees that their contracts were being prepared"; yet, like Plaintiff, Mercy did not hire her.  Most importantly, Plaintiff admitted that he did not know who Mercy hired from CNR.  Though Plaintiff believed that Mercy hired no Black employees from CNR, he does not dispute that 50.2% of the faculty and staff members Mercy hired in 2019 (109 of 217) identified as Black.

9

Plaintiff merely recites certain facts about Defendants Herrera and Hall, such as their involvement in Mercy's hiring.  These facts show neither pretext nor do they support an inference that racial animus had anything to do with the decision not to hire Plaintiff.

### b.  Herrera and Hall

The § 1981 discrimination claim against Herrera and Hall fails for the same and additional reasons.  The claim against Herrera and Hall rests on Plaintiff's allegations that those Defendants treated him differently from others; they offered Plaintiff and others a position at Mercy and did not hire Plaintiff but did hire the others who are not Black.  As discussed above and further explained below, the undisputed evidence contradicts Plaintiff's assertion of discriminatory intent.

As to Defendant Herrera, the claim fails at the third step of the *McDonnell Douglas* analysis, assuming the first two steps are resolved as described above.  Herrera was Provost and Vice President of Academic Affairs of Mercy, and as such, was the chief academic officer at Mercy.  Assuming the facts as Plaintiff presents them, in around March 2019, Defendant Herrera met with a group of CNR employees, including Plaintiff.  Herrera said that those employees were "always going to be brought on board," and the "contracts [were] being prepared but they were not ready at the time of this meeting," but had the contracts been ready, Herrera would have had them all signed at the meeting.  Plaintiff asserts that Mercy hired everyone at that meeting except for him.  The parties agree that Herrera made final approvals of the faculty Mercy would hire from CNR based on recommendations by department heads, the search committee and deans.  Herrera did not reject any recommendations or proposals for Mercy to hire any individual faculty member from CNR, nor did he reject an application by Plaintiff for employment with Mercy.  Although Herrera could be liable if he acted with racial animus in accepting a

10

recommendation not to hire Plaintiff, or a group of Black CNR employees that included Plaintiff, Plaintiff points to nothing in the record that would support a finding that Herrera acted with racial animus.

As to Defendant Hall, the record does not support even a prima facie case of discrimination. He was President of Mercy in 2019. Assuming Plaintiff's version of the facts, during a student meeting in April 2019, Hall said in response to a student question that Plaintiff would "remain Campus Director" along with other staff after the transition to Mercy, but Plaintiff did not get the position. The parties agree that Hall was not involved in the decision not to hire Plaintiff. Hall's limited involvement was to hire CNR's President as a Mercy Vice President and to make decisions regarding nursing staff. On this undisputed record, Hall did not act with discriminatory intent, because he did not act at all in the decision not to hire Plaintiff.

### 2. NYSHRL

Summary judgment is granted to Defendants on the NYSHRL claim. The claim fails for the same reasons as the § 1981 claim because the evidence does not support an inference of discriminatory intent. The claim also fails because it is time barred.

### a. Discriminatory Intent

The degree of causation required by the NYSHRL in this case is somewhat unclear because the statute was amended in 2019 to adopt a more lenient pleading standard for plaintiffs. *See Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 363 n.3 (2d Cir. 2025). As amended, the NYSHRL states: "The provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. L. § 300. The effective date of that provision was August 12,

2019.  *Id.*; *see Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) ("[T]he amendment directs courts to construe the NYSHRL liberally for the accomplishment of the remedial purposes thereof . . . .  The amendment took effect on August 12, 2019, before [the plaintiff's] claims arose.").

In this case, it is unclear when Plaintiff's claims arose.  He was fired on August 16, 2019, after the amended statute became effective, but the decision to assign to Dr. Johnson Plaintiff's previous duties and presumably not to hire Plaintiff was made in spring 2019, before the amended statute became effective.  Additionally, Plaintiff filed his NYSDHR complaint on August 7, 2020, in which he identified March 18, 2019, as the most recent date of discrimination.

Regardless of which causation standard applies, Plaintiff's NYSHRL claim fails because, based on the record evidence, no reasonable jury could find discriminatory intent.  *See Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 123 (2d Cir. 2024) (declining to decide whether the NYSHRL amendment applies retroactively to the plaintiff's claim which arose before the amendment, because the claim failed under both the pre- and post-amendment standard).  Under the less rigorous post-amendment standard, a defendant must "demonstrate that it is entitled to summary judgment under the mixed-motive standard."  *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085, 2025 WL 704278, at *2 (2d Cir. Mar. 5, 2025) (summary order) (New York law).  "This allows the plaintiff to rebut the employer's legitimate reasons by establishing that the action was motivated at least in part by . . . discrimination rather than requiring the plaintiff to prove that the reason proffered by the employer for the challenged action was actually false or entirely irrelevant."  *Id.*  Summary judgment is therefore appropriate "only when the record establishes as a matter of law that discrimination . . . played no role in the defendant's actions."  *Id.*; *see Edelman*, 141 F.4th at 49 ("To show causation under the NYSHRL and NYCHRL, a

12

plaintiff need only show that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct."); *Cruz v. 32BJ SEIU*, No. 22-2753, 2024 WL 676237, at *2 (2d Cir. Feb. 20, 2024) (summary order) (New York law).  For the reasons above, no reasonable jury could find that the facts support an inference that any of the Defendants discriminated against Plaintiff *because of* his race.  *See Knox v. CRC Mgmt. Co.*, 134 F.4th 39, 47-48 (2d Cir. 2025) (analyzing a Black woman employee's § 1981, Title VII and NYSHRL claims all under the *McDonnell Douglas* burden-shifting framework and explaining that "[m]eeting her burden under this framework would also satisfy her burden under the more lenient New York City Human Rights Law").

### b.  Statute of Limitations

The NYSHRL claim fails for the additional reason that it is time barred.  Claims under the NYSHRL must be filed "within three years after the alleged unlawful discriminatory practice."  N.Y. Exec. L. § 297(5).  Plaintiff identified March 18, 2019, as the most recent date of discrimination in his NYSDHR complaint, and the decision to assign to Dr. Johnson Plaintiff's previous duties and presumably not to hire Plaintiff was made in spring 2019.  Plaintiff was fired on August 16, 2019.  Assuming the date when Plaintiff's claim accrued was the latest of these dates, the date of his termination, his claim is time barred because he filed the instant Complaint on August 16, 2023, which is four years after the alleged unlawful discriminatory practice and outside of the three-year limitations period.

Plaintiff argues that the statute of limitations was tolled during the pendency of his complaint before the NYSDHR.  That argument is incorrect because it fails to account for the fact that Plaintiff requested voluntary dismissal of the NYSDHR complaint.  A person may

request that the NYSDHR "dismiss the complaint and annul his or her election of remedies so that the human rights law claim may be pursued in court." *Id.* § 297(9).

> [I]f a complaint is so annulled by the division, upon the request of the party bringing such complaint before the division, such party's rights to bring such cause of action before a court of appropriate jurisdiction [are] limited by the statute of limitations in effect in such court at the time the complaint was initially filed with the division.

*Id.* Consequently, the statute of limitations was not tolled for the period of the administrative proceeding because Plaintiff requested its voluntarily dismissal. *See N.Y. State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 161 (2d Cir. 2001) ("If . . . an annulment is made, any judicial proceedings are subject to New York's general three-year statute of limitations, measured from the occurrence of the discrimination, with no tolling for the period in which the claim was pending in the administrative process."). Tolling does not save the NYSHRL claim.

#### B.    Breach of Contract Claim Against Mercy

On the breach of contract claim, summary judgment is granted to Mercy, the only Defendant named in that claim. New York law governs that claim because the parties assume that it does. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (stating that where the parties' briefs assume that a particular state law controls, "such implied consent is . . . sufficient to establish the applicable choice of law"); *accord Bulgari v. Bulgari*, No. 22 Civ. 5072, 2025 WL 1558355, at *2 (S.D.N.Y. June 2, 2025). Under New York law, a breach of contract requires that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022). The contract claim fails because no reasonable jury could find the existence of an employment contract between Plaintiff and Mercy.

"[A] binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement." *Wu v. Uber Techs., Inc.*, 260 N.E.3d 1060, 1070 (N.Y. 2024). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.*; *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."). "To form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 68 N.E.3d 683, 689 (N.Y. 2016); *accord WSP USA Bldgs., Inc. v. AECOM Ltd.*, No. 23 Civ. 2858, 2025 WL 2606886, at *5 (S.D.N.Y. Sep. 9, 2025).

"In considering whether a binding contract exists, the first step is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." *Kolchins v. Evolution Mkts., Inc.*, 96 N.E.3d 784, 787 (N.Y. 2018). To determine whether a course of conduct creates a legally enforceable contract, "it is necessary to look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Id.* "In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Id.* at 787-88. "Under New York law, a contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct." *Leibowitz*, 584 F.3d at

506-07; *accord Andrews v. Sony/ATV Music Publ'g, LLC*, No. 15 Civ. 7544, 2017 WL 770614, at *4 (S.D.N.Y. Feb. 24, 2017) (New York law).

Here, viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find a binding contract. Plaintiff is incorrect that Defendant Herrera's March 2019 statement to Plaintiff in a group setting constituted an offer. Assuming the facts as Plaintiff presents them, in March 2019, Defendant Herrera said to a group that included Plaintiff, "You're coming back, I have a position for you," and the "contracts [were] being prepared but they were not ready at the time of this meeting," but had the contracts been ready, Herrera would have had the contracts all signed at the meeting. Similarly, no offer was made when Plaintiff heard Hall's response to a student's question in a group setting that Plaintiff would remain Campus Director.

These communications did not include essential terms such as duration of employment or any amount of compensation. Plaintiff did not receive or sign any written documentation of an offer and never spoke with anyone at Mercy to confirm or follow up on an offer. The April 2019 WARN Letter did not promise employment at Mercy for all CNR employees, stating only that "Mercy may hire some of CNR's employees; however, details on such hiring have not yet been developed," and "a limited number of CNR employees may be hired by Mercy College." In these circumstances, there was no offer definite and specific enough that its "unequivocal acceptance [would] give rise to an enforceable contract." *See Kolchins*, 96 N.E.3d at 787. No reasonable jury could find that was there "a meeting of the minds" concerning "all material terms." *Stonehill*, 68 N.E.3d at 689.

Further, Plaintiff's purported acceptance was "an applause and a thank you" in a group setting in response to Hall's response to a student that Plaintiff would be hired. No reasonable

16

jury could find that such conduct constitutes an objective manifestation of assent. Summary judgment is granted to Mercy on the breach of contract claim.

Summary judgment is granted on the breach of contract claim for the additional reason that, even if there was a contract, Mercy was entitled to terminate it before Plaintiff assumed the position. Under New York law, an employment agreement is presumed to be "at-will" absent an express or implied agreement otherwise, meaning that Mercy would have been entitled to terminate an employment contract with Plaintiff at any time. *See Goldman v. White Plains Ctr. for Nursing Care, LLC*, 896 N.E.2d 662, 664 (N.Y. 2008) ("[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."); *Gootee v. Glob. Credit Servs., LLC*, 32 N.Y.S.3d 105, 108 (1st Dep't 2016) (same).

## IV.    CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** to Defendants. Defendants' motion for oral argument is **DENIED as moot**.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 131 and 150 and to close the case.

Dated: March 18, 2026
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

17